STATE v. SOUTHERN RAILWAY COMPANY.

(Decided May 24, 1898.)

*Indictment for Discrimination in Railroad Rates— Free-passes—Penal Statute, Construction of—Indictable Offence—Intent—Indictment.*

1.  Section 4 of Ch. 320, Acts of 1891 (Railroad Commission Act), which prohibits the making of a greater charge against one person than against another for a like and contemporaneous service under substantially similar circumstances and conditions, applies to the carriage of both persons and property without regard to the social, political or business influence or distinction of the persons served.

2.  The transportation, by a common carrier, of any person (except of the classes specified in Section 23 of Railroad Commision Act) without charge, is unlawful under Section 4 of said Act, the offence being the actual free transportation and not the issuance of the free pass.

3.  Where an act is forbidden by Statute the doing of it constitutes the offence, and the intent with which it was done is immaterial.

4.  Where an act is made an offence by statute, without reference to the intent, a charge in an indictment that it was wilfully done is surplusage, and the intent need not be proved.

5.  In construing a penal statute prohibiting discrimination between passengers, the construction placed on it by common carriers generally and by private individuals and officials, will not be considered.

INDICTMENT for unlawful discrimination in the transportation of passengers by a railroad company, tried

before *Timberlake, J.*, at March Term, 1898, of Wake Superior Court.   The facts appear in the opinion.

*Messrs. W. C. Douglass* and *Cook & Green*, for State.
*Mr. F. H. Busbee*, for defendant (appellant).

MONTGOMERY, J.:   The defendant Company was indicted for an unlawful discrimination in the transportation of passengers, under section 4 of Chapter 320 of the Acts of 1891.—The Railroad Commission Act.   Section 4 of that Act is in the following words:   "That if any common carrier subject to the provisions of this Act shall directly or indirectly, by any special rate, rebate, draw back or other device, charge, demand, collect or receive from any person or persons a greater or less compensation for any service rendered or to be rendered in the transportation of passengers or property subject to the provisions of this Act than it charges, demands, or collects or receives from any other person or persons for doing for him or them a like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances and conditions, such common carrier shall be deemed guilty of unjust discrimination, which is hereby prohibited and declared to be unlawful."   Section 25 of the Act is written as follows: "That nothing in this Act shall prevent the carriage, storage, or handling of property free or at reduced rates for the United States, State or municipal governments, or for charitable purposes, or to or from fairs or exhibitions for exhibition thereat, for the free carriage of destitute and homeless persons transported by charitable societies and the necessary agents employed in such transportation, or the free transportation of persons traveling in the interest of orphan asylums or any department

thereof, or the issuance of mileage, excursion or commutation passenger tickets; nothing in this Act shall be construed to prohibit any common carrier from giving reduced rates to ministers of religion, or to municipal governments for the transportation of indigent persons, or to inmates of national homes or State homes for disabled volunteer soldiers and of soldiers' and sailors' orphan homes, including those about to enter and those returning home after discharge, under arrangement with the boards of managers of said homes; nothing in this Act shall be construed to prevent railroads from giving free carriage to their own officers and employees, or to prevent the principal officers of any railroad companies or company from exchanging passes or tickets with other railroad companies for their officers or employees . . ."

The bill of indictment was in form as follows:

"The jurors for the State upon their oath do present, that on the first day of July, in the year of our Lord, one thousand eight hundred and ninety-seven, the Southern Railway Company was a corporation operating a line of railway from Goldsboro to Charlotte, in said State, and doing the business of a common carrier in the State of North Carolina subject to the provisions of Chapter 320, Public Laws of 1891; and that the said Southern Railway Company required and received of persons traveling over its line of railway a regular first-class passenger fare of three and one-quarter (3¼) cents per mile for each passenger.

"And the jurors aforesaid do further present that the said Southern Railway Company on the day and year aforesaid, and at and in the county aforesaid, unlawfully and wilfully did collect and receive from one H. L. Grant a less compensation for the transportation of said H. L. Grant from the city of Raleigh to the town

Goldsboro, in said State, than it collected, demanded and received for the transportation of other passengers from the city of Raleigh to the said town of Goldsboro, for a like and contemporaneous service, in the transportation of passengers in its first-class carriages, under substantially similar circumstances and conditions.

"And the jurors aforesaid, on their oath aforesaid, do say that the said Southern Railway Company did then and there wilfully and unlawfully and unjustly discriminate in the collection of passenger fares in favor of the aforesad H. L. Grant and against other persons to whom like and contemporaneous service was rendered, contrary to the form of the statute in such case made and provided, and against the peace and dignity of the State.

"And the jurors aforesaid, on their oath aforesaid, do further present, that on the first day of July, in the year of our Lord, one thousand eight hundred and ninety-seven, the Southern Railway Company was a corporation operating a line of railway from Goldsboro to Charlotte, in said State, and doing business of a common carrier in the State of North Carolina, subject to the provisions of Chapter 320 of the Public Laws of 1891; and that said Southern Railway Company demanded and received a regular passenger fare of three and one-quarter ($3\frac{1}{4}$) cents a mile for passengers traveling in its first-class carriages over its line of railway.

"And the jurors aforesaid do further present, that the said Southern Railway Company on the day and year aforesaid, and at and in the county aforesaid, wilfully and unlawfully did make and give undue and unreasonable preference and advantage to one H. L. Grant, by then and there carrying the said H. L. Grant as a passenger free of charge over its line of railway from

the city of Raleigh to the town of Goldsboro, contrary to the form of the statute in such case made and provided, and against the peace and dignity of the State.

Pou, Solicitor."

The Jury rendered a special verdict in which they found the following facts: "That the defendant is a corporation carrying on the business of a common carrier in the State of N. C. and operates a railroad, part of which line lies beween the cities of Raleigh and Goldsboro in said State; that during the year 1897 the defendant, through its Vice-President, issued to one Hiram L. Grant, who was a member of the General Assembly of N. C., an annual free pass, which was accepted as valid for transportation in the State of N. C.; that on the 1st day of July, 1897, the said Hiram L. Grant was, on the presentation of this annual pass, to defendant's conductor, transported free by the defendant between the cities of Raleigh and Goldsboro in said State; that upon the train there were persons who paid for their transportation at the rate of three and a quarter cents per mile for first-class passengers; that during the greater part of the year 1897 passes of substantially like character were issued to the Chief Executive and to the State 'officers and to members of the Railroad Commission, as they had been for many years previously and were accepted and used by them in the same manner as by the 'said Grant; that the members of the Railroad Commission are charged with the duties as set forth in Chapter 320 of the Acts 1891; that the officer of defendant who issued the annual pass was advised by counsel and by members of the Railroad Commission that he was not violating the law of the State; there was no actual intent to violate the law upon the part of the officer of defendant issuing the

pass." Judgment was pronounced on the special verdict against the defendant and the minimum penalty was imposed.

The question presented for our decision is, Does the Act prohibit and make indictable the giving of free transportation to passengers by common carriers? Upon its face clearly it does not in all cases, because in section 25 the giving of such free transportation, or transportation at reduced rates, to certain classes of persons therein particularly specified, is allowed; but the person who received free transportation in this case did not come within either of the exceptions of the statute.

In the argument here the counsel of the defendant company contended that the defendant had not violated the provisions of the statute, First, because there was no intention on its part to violate the law; Second, that the statute does not in express terms forbid the giving of free transportation to passengers and that, if the General Assembly had intended such prohibition, that body ought to have made known its purposes in clear and unmistakable language; Third, that the giving of free transportation to a particular person, while it charged for like and contemporaneous service another person the prescribed rate of fare, is not an unjust discrimination; that thereby no injustice is done to the person who pays his fare, for he has only paid what the law declares a fair price for the service rendered; Fourth, that the "dead-head" and the paying passenger do not necessarily stand "*Under substantially similar circumstances and conditions*," as contemplated in the statute; and, last, that the Act itself has received an almost universal and practical construction in accordance with the foregoing views by the habit of railroad

122—67

companies generally giving free passes since the enactment of the law, just as they did before, to "gentlemen long eminent in the public service," "higher officers of the State, members of the legislature, members of the Railroad Commission, etc."

The crucial point in the case is centered around the defendant's contention and assumption that the "like and contemporaneous service" in the transportation of two individuals, one carried free and the other for the prescribed tariff rate, is not necessarily "under substantially similar circumstances and conditions;" that is, that the company can take into consideration, as to whether it will give free transportation to a passenger, the circumstances and conditions which surround two persons, and, if one is a "higher official" or a large shipper, or a politician of power whose influence may be of service to the company, or one of social distinction, and the other a laborer, then the conditions and circumstances are not the same and, therefore, the statute does not apply. Of course, if this contention of the defendant is sound, this case is at an end, and the free transportation of passengers is therefore in no case unlawful. So, we will examine that position of the defendant first in order.

What then in respect to the transportation of passengers in connection with the statute is meant by the words "substantially similar circumstances and conditions?" It cannot be doubted that, if each of two persons desired to ship a thousand pounds of freight of like kind over a railroad between the same points and at the same time, the company must render the same service at the same rate to both, whether one of the shippers was a politican with a "pull," or a "higher officer," or a member of the legislature or of Con-

STATE *v.* RAILWAY.

gress, or a laborer.   Beyond question, that would be a
like and contemporaneous service in the transportation
of a like kind of traffic under "substantially similar
circumstances and conditions."

In our opinion, Section 4 of The Act in plain words
prohibits the making of a greater charge against one
person than against another, for a like and contempo-
raneous service under substantially similar circumstances
and conditions, applicable to the carriage of both pas-
sengers and property.   The language is so clear "that
he may read who runs."   In contemplation of Section
4 of the Statute, the only possible difference between
two individuals is that in relation to the size of their
bodies; but this can have no bearing upon the matter of
transportation, as the difference in size or weight of
persons (over a certain age) has not yet been regarded
in the business "of hauling passengers" as ground for
making difference in passenger rates.   Boiled down,
the contention of the defendant on this point is just
this:   "If one person should be the governor of the
State, a member of Congress or of the General Assem-
bly, or a leader in what is called the business or the
social world, and the other is an ordinary toiler for his
bread, a case of substantially *dissimilar* circumstances
and conditions exist, and the company may give the
favored ones free transportation for their influence,
and charge and receive from the other full fare because
he has no influence.   Can it be supposed for a moment
that the General Assembly of North Carolina would
enact a law, a law purporting to protect the great body
of the people against inequality and unjust discrimi-
nation on the part of railroad companies, based on
such class distinctions?   This contention of the defen-
dant, if it could be maintained, would simply divide

the people of the State, not into the sheep and the goats, the good and the bad, and reward or punish them by giving to one and withholding from the others free passes, but into those whose influence is considered valuable to the corporation on the one part, and the remainder of the people on the other, and then giving to the first named class the privilege of using the public franchise free, while it extorts from the latter the full rates allowed by law; the extortion consisting in making those least able to bear it. pay the cost of transporting the well-to-do and influential. That position of the defendant cannot be maintained.

We will now consider the other positions of the defendant: It was insisted that the company was ignorant of the provisions of the law in respect to the prohibition of the free transportation of passengers and that it had no intention to commit the offence with which it is charged; and counsel dwelt especially upon that finding in the special verdict in which the jury said "There was no actual intent to violate the law upon the part of the officer of defendant issuing the pass." Who was the officer of the company who issued the pass and who put into the hands of the "deadhead" passenger the piece of paper which secured his free transportation that his intention should be inquired into? Probably some local attache. What notice does the law take of his intentions or purposes in the matter before us? The thing which was denounced by the statute and for which the defendant is indicted, is not the *act of giving the free pass*, the mere handing to the passenger the piece of paper on which was written the privilege of riding free, but the *act* of *transporting the favored passenger without charge or the payment of fare.* The law would be violated if no pass was actually

issued, if the passenger was carried free. The favored passenger might be known personally to the conductor, or be made known to him by preconcerted signs, or mileage books distributed *gratis* or sold at reduced rates; and in other ways the law might be violated. But we leave the matter of the handing over, by the officer, of the free pass to the passenger and his intention in so doing, as it has no bearing in the case; and we will take up the question of the intent of the acting, working, planning corporation in its giving the free transportation.

If there is anything well settled by the decisions of this court it is that, wherever an act is denounced as unlawful by statute, the doing of that act constitutes the offence, and the intent with which the act is done is immaterial; and this has been settled law for a long period of time. In the case of *State* v. *King*, 86 N. C., 603, the Court said, "When an act forbidden by law is intentionally done *the intent to do the act is the* criminal intent which imparts to it the character of an offence; and no one who violates the law, which he is conclusively presumed to know, can be heard to say that he had no criminal intent in doing the forbidden act." In *State* v. *McBrayer*, 98 N. C., 619 it is held that when the statute plainly forbids an act to be done and it is done by some person, the law implies conclusively the guilty intent although the offender was honestly mistaken as to the meaning of the law he violates. In *State* v. *Voight*, 90 N. C., 741 the Court said, "The criminal intent is inseparably involved in the intent to do the act which the law pronounces criminal." To the like effect are the decisions in *State* v. *Kittelle*, 110 N. C., 560; *State* v. *Downs*, 116 N. C., 1064; *State* v. *Chisenhall*, 106 N. C., 676; *State* v. *Scoggins*, 107 N. C., 959; *State* v. *McLean*, 121 N. C., 589.

It is to be observed that in the Section of the Act, under which this defendant was indicted, neither the word "intent" nor any word synonymous with the word intent was used. The Act simply denounced the unjust discrimination. And, besides, Section 25 of the Act excepts from the provisions of Section 4 certain carefully specified classes of persons, and such explicit enumeration of the excepted classes absolutely and necessarily excludes all other persons. It is true that in the bill of indictment the word "wilfully" was used in connection with the discrimination, and it was insisted for the defendant that a vicious or covinous intent on its part was necessary to be proved. But that did not follow even if such intent had been alleged in the indictment. It would have been surplusage. *State* v. *Edwards*, 90 N. C., 710; *State* v. *Keen*, 95 N. C., 646. It is only where a statute makes the particular intent an essential element of the crime that it need be charged and proved." *State* v. *McArter*, 98 N. C., 637. As to the plea of ignorance of the statute in reference to unjust discrimination between passengers, it is only necessary to cite some of the numerous decisions of this court on that point. In *State* v. *Downs*, *supra*, the court said: Ignorance of the law excuses no one, and the vicarious ignorance of counsel has no greater value." *State* v. *Boyette*, 32 N. C., 336. The law does not encourage ignorance in either. *State* v. *Dickens*, 2 N. C., 406. If ignorance of counsel would excuse violations of the criminal law, the more ignorant counsel could manage to be the more valuable and sought for, in many cases, would be his advice."

But how is it possible to seriously consider that the defendant acted in this matter in ignorance of the law? It is not too much to say in a judicial opinion that the

defendant is represented in its legal department by many of the best equipped lawyers in the country ; and it would be a most violent presumption to say, or even to think, that they were not thoroughly posted as to the laws, State and Federal, concerning the interests and liabilities of their clients under this statute.   Through their counsel the defendant must have been acquainted with the Act of Congress concerning Inter-state Commerce and the rulings of the Commission (Interstate) upon the Act ; and that Act in Section 2 is in the very words of the fourth section of the Act of our General Assembly, Chapter 320, Acts 1891—the law under which the defendant is indicted. · The defendant could hardly be ignorant, in fact, of the decided cases reported by the Inter.state Commerce Commission on the matters about which the defendant is before the court.   In the case of *Griffee.* v. *Burlington, etc. R. Co.*, in Nebraska, before that Commission (2 Inter-state Com. Reports, 301) the report and opinion filed nearly ten years ago, it was held in effect that free transportation to a passenger was in contravention of Sectien 2, of the Act (U. S.), to regulate commerce (that section being, as we have said, identical with Section 4 of the Act of our General Assembly of 1891).   In the same volume (p. 359) in the case of *Slater* v. *N. P. Railroad Co.*, it was declared that free transportation furnished on an annual pass to a person not embraced in one of the excepted classes was illegal.   In that case it was further said by the Commission: "Carriers can reward persons not· in their stated and regular employment for occasional services or benefits indirectly received, in other and better ways than by furnishing them with free transportation.   It may be said that a pass costs the carrier little or nothing, and that when the good

will and occasional good words of a person, who is able
to influence the direction of traffic, can be obtained· so
cheaply, it is a hardship to prevent the carrier from
making use of the opportunity; but the evils in the
unrestricted employment of free passes by common car-
riers had grown so great and had become so apparent,
both to the public and to the carriers themselves, that
it was deemed by Congress to be absolutely necessary
to eradicate the whole system from Inter-state Com-
merce in order to put an end to the abuses which had
grown beyond the limits of any other regulation or con-
trol.    The law was framed accordingly prohibiting the
giving of free transportation to passengers carried under
substantially similar circumstances and conditions as an
unjust discrimination under the general terms employed,
with only the exception made in Section 22.    .    .    ."

In the third annual report of the Inter-state Commerce
Commission (Vol. 3, p. 300, filed November 30, 1889) it
is stated that "the statute (Inter-state Commerce Act)
undoubtedly was framed to prohibit passes or free trans-
portation of persons as one of the forms of unjust dis-
criminatien, favoritism and misuse of corporate powers
that had grown into an abuse of large proportions and
become demoralizing in its influence, and detrimental
to railroads, both in loss of revenue and in provoking
public hostility.    One of the minor and meaner phases
of this abuse is the distinctive preference shown in vari-
ous ways by employees both in service and civility to
holders of passes, as if discrimination by free carriage
includes discrimination in treatment of passengers."

"It is well known that persons who are carried free
were to a large extent precisely the persons who had
no claim whatever to such favors.    They were officials
and others from whom free passes might be expected to

secure reciprocal favors, and men of wealth and promi-
nence who rode at the expense of others less able to pay;
or the passes were given to influence business. In
nearly all cases, not specially exempted by the Act, the
motive in demanding or giving them was one deserving
of no favor.    The principle of equality under like con-
ditions for the traveling public had been grossly violated
by the railroads, favored persons or classes of persons
had been furnished free transportation at the expense
of the general public by higher general charges to reim-
burse for gratuitous carriage."

It is of interest to observe that it appears from that
report that the returns of the railroad companies
embraced therein show the largest number of Inter-
state free passes issued were designated as "compli-
mentary."   The next most numerous classes embraced
steamship and transportation lines, officers, Federal,
State and municipal, palace car companies and news-
papers.   Of State free passes, the largest number were
issued to members of the legislatures, drovers with
"complimentaries" next, and United States, State and
municipal officers, newspapers and shippers next in
numbers.

In the investigation of this subject as it affected the
Boston and Maine Railroad Company (Inter-state Com-
merce Report, Vol. 5, p. 69, December, 1891), it was
decided by the Commission that the giving of free
passes to others than those embraced in the exceptions
was illegal.   The opinion of the Commission was in the
following words:   "The construction we give to Sec-
tion 2 of the Act to regulate commerce is that, where
the service by the carrier subject to the Act is like and
contemporaneous for different passengers, the charge
to one of a greater or less compensation than to another

constitutes unjust discrimination and is unlawful, unless the charge of such greater or less compensation is allowed under the exceptions provided in Section 22 and that, where the traffic is 'under substantially similar circumstances and conditions' in other respects, it is not rendered dissimilar within the meaning of the statute by the fact that such passengers hold unlike or, as sometimes termed, unequal official, social or business positions, or belonging to different classes as they ordinarily exist in a community, or are arbitrarily created by the carrier. Under this construction of the Act, the practice of the defendant in giving free transportation, such as it concedes was issued "to gentlemen long eminent in the public service," "higher officers of States and prominent officials of the United States, members of legislative railroad committees, persons whose good will is important to the corporation," is unwarranted, unless the favored person also comes under some exception specified in Section 22, of the Act to regulate commerce. In this matter it was that Mr. Richard Olney (afterwards Attorney General under Mr. Cleveland), who represented the Boston Railroad Company, stated in his brief that Mr. Chandler, who brought the proceeding for the people, was inspired to make the charges in the complaint by "personal spite and political considerations."

The report goes on however to say that "Mr. Chandler made a reply not without interest or point." In the same decision the Commission said further: "Other utterances and decisions of the Commission to the same legal effect have been made every year since its organization, and its construction of the Act has been indicated by its repeated recommendations to Congress to add other classes of persons to the exceptions (as they were always regarded by the

Commission) contained in Section 22. We find not only these views held by the Commission from its organization but by the Federal Courts when the question has arisen." The case of *Harvey* v. *L. & N. R. Co.*, reported in Volume 5, Inter-state Commerce Commission, Report 153, closes with the following declaration: "The fundamental and pervading purpose of the law is equality of treatment. It assumes that the railroads are engaged in a public service and requires that service to be impartially rendered. It asserts the right of every citizen to use the agencies which the carrier provides on equal terms with all his fellows, and finds an invasion of that right in every unauthorized exemption from the charges, commonly imposed. No form of favoritism and no species of partiality seem more odious or indefensible than that which accords to personal influence or public station privileges not enjoyed by the community at large. The free carriage of certain persons merely because they occupy official positions, or have acquired some measure of distinction offends the rudest conception of equality and contravenes alike the policy and the provisions of the statute."

As to the last position of the defendant, that is, the alleged practical construction which the common carriers and the favored passengers have put upon the statute, the first giving and the last receiving free transportation, just as they did before the enactment of the statute, and assuming that the general community have adopted that as the proper construction of the law, we have nothing to say, except that it would seem to all reasonable minds that such a construction could not be the proper one, and that the law as often construed by the Inter-state Commerce Commission, which construction seems true to us, is a just and wholesome law.

In the face of the clearly expressed provisions of the law and in the face of the repeated constructions of that part of the Federal statutes regulating interstate commerce, which is in precisely the same words in which our statutes is framed upon the point now before us, the defendant took its chances. . It has in doing so violated the criminal law of the State and must abide the consequences as all others ought to do who break the laws. It must be presumed that common carriers know well what they are doing in this matter. They are not, and neither do they wish to be considered, charitable institutions; they are corporations formed for profit and gain; and whenever they grant a thing of value—free transportation to a passenger not embraced in the excepted classes specified in the Act—they must be acting, as they think, on business principles expecting a return upon their investments. If, in pursuing their business interests, they violate the law, they must abide the result. There is no error and the judgment is

Affirmed.

DOUGLAS, J., dissenting :—I feel compelled to dissent from the judgment of the court; but in doing so, I wish to express my unqualified concurrence in the able opinion of Justice MONTGOMERY, except in so far as it necessarily conflicts with what is said herein. That free transportation, under whatever device it may be given, is prohibited by the Act of 1891, unless covered by the statutory exceptions, is unquestionable; and I am glad that it has now been settled by a unanimous court. Such a construction is in strict accordance with the settled rules of judicial interpretation and with the highest principles of public policy.

It is currently reported that a hundred thousand passes were issued in the State of North Carolina within

the year 1897.   Of our three leading railroad systems, one reported over fifteen thousand passes issued, while another reported thirty thousand.   The defendant herein, the largest system of all, and having a direct pecuniary interest of vital importance before the legislature, refused to make any report, relying upon its legal exemption from compulsory self crimination. Taking the estimate of 100,000 passes as correct, as it is 397 miles from Raleigh to Murphy on the West, and still further to Elizabeth City on the East, it is fair to assume that each pass would represent at least one hundred miles of travel, equal to $3.25 in fare.   This would represent the equivalent of $325,000 a year given to somebody, but to whom we do not know, and for what purpose we need not enquire.   These figures may not be correct, but they are the best obtainable under the circumstances.   It is needless to suppose that transportation of such great pecuniary value would be given without some return either present or prospective: and in any aspect its continuance would be unjust to the public interest and dangerous to the public welfare.   Free transportation to so large an amount would necessarily place an additional burden upon the travelling public to make up the deficiency; while its irresponsible distribution would be a serious menace to public morality.   So far, I fully concur in the opinion of the court; but, to convict a person charged with crime, it is requisite not only to determine that a crime is committed but also that the defendant is guilty of the crime.

The defendant here admits a free transportation, but pleads want of intent.   Ordinarily the admission of the forbidden act would be conclusive evidence of guilt; as in misdemeanors, at least, the intent to commit the act is the criminal intent, unless the statute itself consti-

STATE *v.* RAILWAY.

tutes the intent the gravamen of the offence.    In this action, however, there seem to me so many peculiar circumstances that have never happened before, and may never happen again, as to take the case out of the usual rules of construction, and force us to regard it *sui generis.*

If the Act itself forbade the issuing of passes in express terms, it would be an end of the question.    But it does so only by implication as is shown in the opinion of the Court.    It is true it seems to us a clear and necessary implication; but it evidently did not seem so to the higher officers of State and members of the Legislature who accepted these passes.

We can scarcely ask a clearer insight into the law and a nicer sense of propriety from the soulless corporation than we do from those who make and enforce the law. This Act was ratified March 5, 1891, more than seven years ago.    Since then we have had four different legislatures, three governors and seven different railroad commissioners as well as two complete sets of solicitors. I do not mean to impute any improper motive to these men, many of whom I personally know, and whose names and characters are too well known to need any vindication from me; but is it not possible that the defendant may have been honestly misled in issuing passes to them from the mere fact that they would receive them?    The giving of a pass is only *malum prohibitum,* and not *malum in se,* and is neither as to the one that receives it.    There is nothing innately wrong in it, further than that it is prohibited by law and may lead to dangerous abuses.    Moreover, section 5 of the Act under consideration provides that the Railroad Commissioners "*Shall* make such just and reasonable rules and regulations as may be necessary for preventing unjust discrimination in the transportation of freight and passengers on the railroads in the State."

It was the imperative duty of the Commission, without any outside suggestion, to make all just rules necessary for carrying out all the provisions of the Act, the proper enforcement of which was the sole object of their official existence. We have held, in *Caldwell* v. *Wilson*, 121 N. C., 425, 472, that the Commission is an *administrative* and not a judicial court ; and this view is still more strongly expressed by the Supreme Court of the United States in *Reagan* v. *Loan & Trust Co.*, 154 U. S., 362, 397, where it says : "Such a commission is merely an administrative board created by the State for carrying into effect the will of the State as expressed by its legislature." It is their duty to actively enforce the law, and to prevent, and, if necessary, prosecute, all violations thereof that may come to their knowledge in any manner. They are the active instruments of its enforcement, and are not merely required to construe it upon a sworn complaint. For the purposes of their creative act, they are the grand inquest of the State, and should diligently enquire and true presentment make of all its violations. Any other construction of their powers and duties would destroy their usefulness and make the commission a mere excrescence upon the Judicial system of the State. As a court, their powers are very limited; but, as a commission, they are charged with grave and responsible duties of the State, and are clothed with ample powers for their performance. While they may be compelled to appeal to the courts for the ultimate enforcement of their decisions, they possess powers beyond the jurisdiction of any court, and which, if properly exercised, may be made of inestimable value to the people. The mere fact of thorough investigation, and consequent publicity, of existing abuses will strongly tend to their correction.

The jury find in their special verdict:  "That the officer of defendant who issued the annual pass, was advised by counsel and by *members of the Railroad Commission* that he was *not* violating the law of the State;" "that there was no actual intent to violate the law upon the part of the officer of defendant issuing the pass." They further find that during the year 1897 passes were issued to members of the Railroad Commission which, using the plural, must mean a majority of the commission, of whom there are only three. In a case of doubt, where the act·was not expressly prohibited in words by the statute, to whom better could the defendant have gone than to those charged in express terms with its enforcement? What more positive answer could it have received than the answer of a majority of the commission that it was not unlawful, coupled with the personal acceptance of a pass? ˙ I do not question the integrity of the commissioners. They were doubtless honestly mistaken, misled perhaps by the universal custom throughout the United States; but so, also, may have been the defendant. Is it not fair to say that it was innocently misled ?

The possible results of an adverse decision to the defendant are practically beyond calculation. If it has issued fifty thousand passes a year for the two years within the statute, it is not probable that over forty thousand were issued to the excepted classes, leaving at least sixty thousand violations of law. This would subject it to penalties of which the minimum would be sixty millions of ·dollars and the maximum three hundred millions. It is true that this may not be the result. Solicitors may not prosecute, the Executive may pardon or the legislature may condone; but with this I have nothing to do. Upon the special verdict

rendered in this case, and in view of the exceptional circumstances that force themselves upon our attention, I think that the defendant should be held not guilty purely upon the ground of intent. This would end the matter, as hereafter there could be no. honest mistake. As this court has now held that free transportation, outside of the excepted classes, is a violation of the Act, no matter under what form or device it may be given, the mere performance of the act will hereafter be deemed conclusive evidence of its guilty intent.

I am aware that, in arriving at my conclusions, I have been forced to ignore some of the general rules of judicial construction, but under the exceptional circumstances appealing so strongly to my judgment I do not feel that we should permit the bar sinister of an iron clad rule of interpretation to lie in cold obstruction across the conscience of the court.