JOHN, RESPONDENT, *v.* NORTHERN PACIFIC RAILWAY
CO., APPELLANT.

(No. 2,859.)

(Submitted September 12, 1910. Decided October 11, 1910.)

[111 Pac. 632.]

*Railroads—Carrier and Passenger—Personal Injuries—Negli-*
*gence—Burden of Proof—Contract of Passage—Free Passes—*
*Invalidity—Excessive Damages.*

Carriers—Passengers—Injuries—Instructions.
    1. In an action against a railroad company for injuries received in
    an accident while plaintiff was traveling on a free pass, furnished
    him by defendant as an official of another railroad company, which
    exempted defendant from liability for injuries caused by its negli-
    gence or otherwise, the court charged, on plaintiff's request, that a
    common carrier cannot be exonerated by any agreement from liabil-
    ity for the gross negligence of itself or servants, so that, if defend-
    ant was guilty of gross negligence, causing plaintiff's injuries, the
    jury must find for plaintiff. *Held,* that plaintiff, by tendering the
    instruction, tacitly adopted the court's theory that plaintiff was rid-
    ing on a free pass, and that the only question in addition to that of
    damages was whether defendant was guilty of gross negligence.
Same—Passengers—Action for Injuries—Negligence—Gross Negligence.
    2. Section 5299 of the Revised Codes requires a carrier of persons
    without reward to use ordinary care for their safety, and section 5300
    requires a carrier for reward to use the utmost care and exercise
    a reasonable degree of skill. *Held,* that a carrier owes a higher degree
    of diligence to one carried for a reward than to one carried without
    a reward, and was only bound to exercise ordinary care for the
    safety of a passenger carried without reward, so that the injury of
    such a passenger by the happening of an accident only showed
    ordinary negligence by the carrier, and not gross negligence.
Same—Passengers—Injuries—Presumption of Negligence.
    3. A presumption of the carrier's negligence arises from the mere
    fact of an accident injuring a passenger, which is caused by some
    agency over which the carrier has control.
Same—Passengers—Injuries—Action—Burden of Proof—Gross Negli-
    gence.
    4. Since the happening of an accident injuring a passenger being
    carried without reward is only evidence of lack of ordinary care by
    the carrier, such a passenger must offer proof to supplement the pre-
    sumption, in order to show gross negligence by the carrier.
Negligence—Presumptions—*Res Ipsa Loquitur* Doctrine.
    5. The presumption of want of care, raised by the *res ipsa loquitur*
    doctrine, is a want of ordinary care.
Carriers—Passengers—Contract—Exemption from Liability for Negligence.
    6. A common carrier of passengers may contract to exempt itself
    from liability for the ordinary negligence of itself or its servants.
Same—Passengers—Contract of Carriage—Free Passes—Validity.
    7. Constitution, Article XV, section 7, provides that all individuals
    shall have equal rights to be transported over any railroad in the state,

provided that excursion or commutation tickets may be issued and sold at special rates. Revised Codes, section 4337, makes it unlawful for any common carrier to charge any person for any ticket a greater sum than is charged for a similar ticket of the same class, and section 8524 makes every railroad corporation which fails to observe any of the duties prescribed by law in reference to railroads subject to a fine, etc. *Held,* that the giving of all free passes, with certain exceptions recognized by law, was prohibited, so that the carriage of a passenger by defendant on a pass issued without compensation to the employee of another railroad company which issued similar free passes for use by defendant's employees was illegal, and hence a provision therein exempting the carrier from liability for injuries caused by its negligence was a nullity.

Constitutional Law—Civil Rights—Equality Before the Law.
8. An arbitrary and unreasonable classification by a statute conferring benefits or imposing a penalty contravenes the constitutional principle that all men are equal before the law, and the legislature in making classifications as for taxation and license purposes must exercise a reasonable discretion.

Statutes—Construction—Remedial Statute.
9. The court must construe a remedial statute so as to suppress the injury and advance the remedy contemplated by the statute.

Carriers—Construction—Penal Statute.
10. A statute may be remedial in part and penal in part for purposes of construction, so that the penalty clause of Revised Codes, section 4337, making it unlawful for any carrier to transfer a person for a less sum than is charged for a similar ticket of the same class, and making any carrier who shall violate the statute guilty of a misdemeanor, and punishable, *etc.,* should be construed according to the fair import of its terms, with a view to effectuating its object as required by section 8096; but the part prohibiting unjust discrimination in charging for transportation should be liberally construed with a view to carrying out the legislative intention.

Same—Passenger on Pass—Personal Injuries—Right to Recover.
11. A passenger injured while traveling under a pass furnished him by defendant gratuitously as the officer of another railroad company, but which, including the provision therein exempting defendant from liability for injuries caused by the negligence of itself or servant, was void as issued in contravention of statute, was not *in pari delicto* with defendant in violating the statute, so as to prohibit recovery for such injuries; the carrier's duty to passengers being imposed by public policy and not founded on the contractual relation between them.

Appeal and Error—Harmless Error—Variance.
12. Where, in an action against a railroad company for injuries to a passenger, the company was liable under the evidence as a matter of law, the fact that the court held that plaintiff was not a passenger for hire, contrary to the theory of the complaint, and yet allowed a recovery, was not prejudicial error.

Same—Harmless Error—Parties not Entitled to Succeed.
13. Where, in an action against a railroad company for injuries to a passenger, plaintiff was, upon the record, entitled to recover damages as a matter of law, any error in an instruction in defining gross negligence was not reversible.

Same—Reversal—New Trial Ineffectual.
14. A judgment will not be reversed because of variance between the pleadings and proof, where it would merely necessitate an amendment to the pleading, resulting in the same verdict.

Personal Injuries—Excessive Damages.

15. A railroad passenger was thirty-nine years of age when injured and in perfect health, and received a salary of $1,800 a year. He now suffers intermittently from a pain in the head, his right side is partially paralyzed, and he has no use of his voice; and the medical testimony was that his injuries were probably permanent and would eventually cause his death, while another witness testified that he was now a physical wreck. *Held*, that a verdict for him for $25,000 was not excessive.

### ON MOTION FOR REHEARING. .

Carriers—Transportation—Free Passes—Right to Issue.

16. Railroad companies may issue free transportation or sell tickets at reduced rates, as the case may require, to its employees and members of their families; to doctors, nurses and helpers being taken to wrecks; to soldiers and sailors going to or coming from institutions wherein they are kept; to ministers or persons engaged in charitable and religious works; and, by the direct provision of Revised Codes, section 4369, to members and employees of the railroad commission traveling on official business, but not when they are traveling on private business, section 4394 prohibiting employees of the commission or the board of commissioners from accepting or requesting any pass for themselves or any other person except as herein otherwise provided.

(MR. JUSTICE HOLLOWAY dissenting.)

*Appeal from District Court, Silver Bow County; John B. Mc-Clernan, Judge.*

ACTION· by Terry A. John against the Northern Pacific Railway Company and another. From a judgment against the defendant named, and from an order denying a motion for new trial, it appeals. Affirmed.

*Mr. Wm. Wallace, Jr., Mr. John G. Brown,* and *Mr. R. F. Gaines* submitted a brief in behalf of Appellant. *Mr. Wallace* argued the cause orally.

The pass exemption contract is a complete defense. While a carrier for *reward,* at the common law, might not exonerate himself from any act of negligence however slight, this prohibition was founded upon principles of public policy, *viz.,* (1) that the carrier for reward was a public servant who had no option to decline the service, but *must* serve and carry on being tendered proper fare or hire; and (2), that in the discharge of that *duty,* the security of property and persons intrusted to him demanded the very highest degree of care. A *gratuitous*

carrier on the other hand was permitted by the common law to exonerate himself from liability for any sort of negligence, however slight. The principle of public policy did not apply to him, for he was at liberty to *refuse* to carry gratuitously if he saw fit, and therefore at liberty to *declare* the *conditions* upon which alone he would perform this *voluntary* service. In submitting this distinction between those carrying for reward and gratuitously, we call attention to the decisions of those courts that have recognized to the fullest extent the rule of public policy limiting the power of the carrier for *reward* to contract for exemption. (See *Muldoon* v. *Railway Co.,* 7 Wash. 528, 38 Am. St. Rep. 901, 35 Pac. 422, 22 L. R. A. 798; *New York Central R. Co.* v. *Lockwood,* 17 Wall. 357, 21 L. Ed. 627; *Northern Pac. Ry. Co.* v. *Adams,* 192 U. S. 440, 24 Sup. Ct. 408, 48 L. Ed. 513; *McCormick* v. *Shippy,* 119 Fed. 226; s. c. 124 Fed. 48, 59 C. C. A. 568; *Cincinnati etc. Ry. Co.* v. *Coal Co.,* 139 Fed. 530, 71 C. C. A. 316, 1 L. R. A., n. s., 533; *Greenwich Ins. Co.* v. *Railroad Co.,* 112 Ky. 598, 99 Am. St. Rep. 313, 66 S. W. 412, 67 S. W. 16, 56 L. R. A. 477; *Missouri Railway Co.* v. *Carter,* 95 Tex. 461, 68 S. W. 165; *Mann* v. *Railway Co.,* 135 Mich. 210, 97 N. W. 724; *Railway Co.* v. *Saulsbury,* 115 Tenn. 402, 90 S. W. 626, 5 Ann. Cas. 744; *Woodward* v. *Railway Co.,* 35 Tex. Civ. App. 14, 79 S. W. 898; *Osgood* v. *Railway Co.,* 77 Vt. 334, 60 Atl. 140, 70 L. R. A. 930; *Stevens* v. *Railway Co.,* 109 Cal. 86, 50 Am. St. Rep. 17, 41 Pac. 783, 29 L. R. A. 751.) It seems clear, under the above decisions, that the common-law rule of public policy forbidding the limitation of liability for negligence only applied to the *common* carrier, *i. e.,* the carrier for reward, as distinguished from the *gratuitous* carrier.

This court has already adopted the views of the supreme court of the United States expressed in the Lockwood case, *supra,* and in similar cases before and since. In an opinion citing nearly all of these decisions in support of the text, it quotes approvingly from *Hart* v. *Railway Co.,* 112 U. S. 331, 5 Sup. Ct. 151, 28 L. Ed. 717, 28 Co-op. 717, as follows: ''It is the law of this court that a *common* carrier may by special

contract, limit his common-law liability, but that he cannot stipulate for exemption from the consequences of his own negligence and that of his servants." (*Nelson* v. *Great Northern Ry. Co.*, 28 Mont. 321, 72 Pac. 642.)

By accepting the pass with a knowledge of the conditions indorsed thereon, plaintiff waived the benefit of any statutes on the subject. (See *Muldoon* v. *Railway Co.*, *Northern Pac. Ry. Co.* v. *Adams, supra.*) Having accepted the privilege, he cannot repudiate the conditions. On the principle that if he repudiates the burden, he cannot claim the benefit, it was held that if a plaintiff were permitted to repudiate the condition, he would place himself in the attitude of a mere intruder on the train. (See *Duncan* v. *Railway Co.*, 113 Fed. 508; see, also, *Railway Co.* v. *Lumber Co.*, 1 Tex. Civ. App. 553, 21 S. W. 290.)

The pass in question was what is known as an "exchange" pass. As such it was subject to the provisions of the Act of Congress approved June 29, 1906, known as the "Hepburn Bill" (1909 Supplement to U. S. Compiled Statutes 1901, p. 1149 *et seq.*). (*United States* v. *Oil Co.*, 148 Fed. 720.) This Act prohibits discrimination in any manner in fares, under heavy penalties, requiring publication of rates and prohibiting extending to any person any privilege or facility in the transportation of passengers, except such as are specified in tariffs. All contracts in violation of the above are illegal and void. (*United States* v. *Williams*, 159 Fed. 310; *Long* v. *Railway*, 130 Fed. 873, 65 C. C. A. 354; *Railway* v. *Mugg*, 202 U. S. 242, 26 Sup. Ct. 628, 50 L. Ed. 1011, 50 Co-op. 1013; *Railway* v. *Oil Co.*, 204 U. S. 426, 27 Sup. Ct. 350, 51 L. Ed. 553, 51 Co-op. 553; *Boering* v. *Railway Co.*, 193 U. S. 451, 24 Sup. Ct. 515, 48 L. Ed. 742, 48 Co-op. 745; *Duncan* v. *Railway*, 113 Fed. 508; *Railway* v. *Lumber Co.*, 1 Tex. Civ. App. 553, 21 S. W. 290.)

Confessedly, plaintiff was not paying the tariff, or any cash fare for this journey and was riding on an interstate pass, not on a ticket. That the pass was used on this particular occasion for a journey in Montana only is wholly immaterial. The pass contract must be tested always by one and the same law. (1 Drinker

on Interstate Commerce Act, secs. 34, 35; *Gulf C. & S. Ry.* v. *Texas,* 204 U. S. 403, 27 Sup. Ct. 360, 51 L. Ed. 540, 51 Co-op. 540–546; *Railway* v. *Grain Co.* (Tex. Civ. App.), 72 S. W. 419.)

The Interstate Commerce Commission, under the power lodged in them by this Act, and on September 15, 1909, issued an order that neither service nor property nor anything save money could be lawfully accepted for transportation. And the federal court has held that such was the effect of the Act independently of the order. (*United States* v. *Railway,* 163 Fed. 115.) Unless he brings himself within some exception of the Act, the pass would be wholly void under the law, and he, knowing the law, be left as an intruder on the train—since the maxim "*in pari delicto portior est conditio defendentis*" must be applied.

The Act prohibits free transportation, with certain exceptions, and then provides that the prohibition shall not prevent the issuance of "interchange" passes or certain other designated free carriage. It would seem to be plain, therefore, that an interchange pass is necessarily a free pass, and one expressly authorized by the proviso in the section dealing with free passes. And the Interstate Commerce Commission has expressly so held. (*Parmalee Bus Cases,* 12 Interstate Commerce Rep. 40.) They have further held that benefit is not essential to the interchange. (*Land Agent Cases,* 12 Interstate Commerce Rep. 8; *Telegraph Cases,* 12 I. C. C. Rep. 11.)

In behalf of Respondent there was a brief by *Messrs. Roote & Murray,* and *Mr. J. E. Healy.* Oral argument by *Mr. Jesse B. Roote.*

This case is governed solely by Montana laws. (See *Justis* v. *Atchison T. & S. Fe Ry. Co.,* 12 Cal. App. 639, 108 Pac. 328.) The question seems settled in the light of national authorities. The power of Congress does not extend to the regulation of commerce carried on wholly within a state. (*Gibbons* v. *Ogden,* 9 Wheat. 1, 6 L. Ed. 23; *Geer* v. *Connecticut,* 161 U. S. 519, 16 Sup. Ct. 600, 40 L. Ed. 793; *Lake Shore etc.* v. *Ohio etc.,* 173 U. S. 285, 19 Sup. Ct. 465, 43 L. Ed. 702.) As bearing directly

upon the question now at bar see: *Chicago M. & St. P. Ry. Co.* v. *Sloan,* 169 U. S. 133, 18 Sup. Ct. 289, 42 L. Ed. 688; *State* v. *Northern Pac. Ry. Co.,* 36 Mont. 582, 93 Pac. 945, 15 L. R. A., n. s., 134, 13 Ann. Cas. 144.

John was a passenger and entitled to the same degree of care as other passengers, similarly carried, and as if he had paid his fare. (*Railway Co.* v. *Derby,* 14 How. 485, 14 L. Ed. 509; *New World* v. *King,* 16 How. 469, 14 L. Ed. 1019; *Waterbury* v. *N. Y. C. & H. R. Co.,* 17 Fed. 671; *Lockwood* v. *N. Y. C.,* 17 Wall. 357, 21 L. Ed. 627; *Gray* v. *Columbia R. Co.,* 49 Or. 18, 88 Pac. 297; *Harvey* v. *Deep Riv. Logging Co.,* 49 Or. 583, 90 Pac. 501, 12 L. R. A., n. s., 131.)

The pass was not free,—it was issued in exchange of and for other passes, from which appellant derived benefit, and for the direct benefit which the defendant company derived from the solicitation of business by John, in which it must necessarily share, and derive benefit therefrom. (*Boering* v. *C. R. Co.,* 20 App. Div. (D. C.) 500; *Harris* v. *P. S. Co.,* 52 Wash. 289, 100 Pac. 838; *Dugan* v. *Railway Co.,* 193 Mass. 431, 79 N. E. 748; *Baker* v. *Boston Co.,* 74 N. H. 100, 124 Am. St. Rep. 937, 65 Atl. 386, 12 Ann. Cas. 1272; *Galveston* v. *Bean,* 45 Tex. Civ. App. 721, 99 S. W. 721; *Nickles* v. *Seaboard,* 74 S. C. 102, 54 S. E. 255; *Petersen* v. *Seattle,* 23 Wash. 615, 63 Pac. 539, 65 Pac. 543, 53 L. R. A. 586; *St Louis* v. *Wallace,* 90 Ark. 138, 118 S. W. 412, 22 L. R. A., n. s., 379; *Eberts* v. *Detroit,* 151 Mich. 260, 115 N. W. 43.) Even if free, the public policy of the state as shown in its Constitution and laws, prohibits such a free pass, and especially the release clause. (*Bradburn* v. *Whatcom,* 45 Wash. 582, 88 Pac. 1020, 14 L. R. A., n. s., 526; *Railway Co.* v. *Pitcock,* 82 Ark. 441, 118 Am. St. Rep. 84, 12 Am. & Eng. Ann. Cas. 584, and note; *Ryckman* v. *Hamilton etc. Co.,* 10 Ont. L. Rep. 419, 4 Am. & Eng. Ann. Cas. 1126; *Yazoo* v. *Grant,* 86 Miss. 565, 109 Am. St. Rep. 723, 38 South. 502, 4 Am. & Eng. Ann. Cas. 556, and note; *Jacobus* v. *Minn. Ry. Co.,* 20 Minn. 125, 18 Am. Rep. 360; *Michigan Drover's Pass Cases,* 5 Am. & Eng. Ann. Cas. 768, note; Revised

Codes, sec. 5298; *Kansas S. Ry.* v. *Carl,* 91 Ark. 97, 134 Am. St. Rep. 56, 121 S. W. 932.)

The state, representing the public, has an interest in every citizen's life and freedom from personal injury, which is even superior to his own interest, and which is closely associated with every public duty which the defendant performs as a common carrier under the Constitution of Montana, and with that interest the citizen may not deal by contract, or in any way so as to subvert the Constitution of the state, or to contravene public policy. (*Nelson* v. *Great Nor. Ry.,* 28 Mont. 321, 72 Pac. 642; *Illinois Central Ry. Co.* v. *Hammer,* 72 Ill. 350; *Warnock* v. *Davis,* 14 Otto, 775, 26 L. Ed. 924; *New World* v. *King,* 16 How. 469, 14 L. Ed. 1019; *Cancemi* v. *People,* 18 N. Y. 128; *Home Ins. Co.* v. *Morse,* 20 Wall. 445, 22 L. Ed. 365; *Cleveland* v. *Curran,* 19 Ohio St. 1, 2 Am. Rep. 365.)

MR. JUSTICE SMITH delivered the opinion of the court.

This is an appeal by the railway company defendant from a judgment pronounced against it on the verdict of a jury in Silver Bow county, for $25,000, and costs; also from an order denying it a new trial. The defendant Skones was released from liability on motion for a directed verdict.

The complaint charged that on August 11, 1907, at Butte, the railway company received plaintiff on its passenger train, "and undertook and agreed to transfer him from Butte to Miles City for a certain reward," and that it was its duty to carry him "in safety and with due and proper care." It further charged that after he had retired into an upper berth of a sleeping-car, the same was negligently, carelessly, and unskillfully derailed, while in rapid motion, and partly turned over, whereby he was thrown out of the berth and injured. The answer, besides a general denial, admits that while plaintiff was riding in an upper berth in a car of its passenger train, the car was partly tipped over; but denies that he was received, or was riding, as a passenger, or for a reward, and avers that he boarded the train, intending to ride, and at the time of the

derailment was riding, upon a certain annual pass which he had presented as his ticket and right to carriage, which pass contained the following conditions: "The person accepting this pass agrees that the Northern Pacific Railway Company shall not be liable under any circumstances, whether of negligence of agents or otherwise, for any injury to the person, or for any loss or damage to the property of the passenger using the same." It is further alleged "that plaintiff was riding and his rights upon said train were under and pursuant to the terms and provisions of said pass contract of carriage and not otherwise." The reply admits that the plaintiff had and held this pass, but alleges that it was issued to him as agent of another railroad, the St. Louis & San Francisco Railroad Company, of which he was a general agent, and in consideration of the issuance by such other railroad of annual passes from the latter to certain agents of the defendant company; and avers that his rights were those of a passenger for hire, and not affected by the conditions stated in the pass.

There was no conflict in the evidence. Desiring to go to Miles City, the plaintiff at about 12:40 A. M., August 12, 1907, at Butte station, boarded train No. 6 of the defendant company, having bought an upper berth in a sleeper from the Pullman Company. The subsequent derailment of the sleeper at a point about seven miles east of Butte caused him to fall from his berth, whereby he was severely and permanently injured. The cause of the derailment could not be ascertained. There was no direct evidence of any negligence on the part of the defendant or any of its servants. The plaintiff was riding on the pass mentioned in the answer, the conditions of which had been by him accepted by signing his name thereto, adding the letters "G. A.," which meant "General Agent." The pass was what is known as an "interchange" pass, and was given to the St. Louis & San Francisco Railroad Company by the defendant company, at the request of the former company, and by it sent to the plaintiff to be used in his business of soliciting passengers and freight for that company. No direct consideration passed

for its issuance, but the two railroads were in the habit of exchanging passes for their respective employees, without regard to which company asked for the greater number. The inscription on the face read: "Pass Mr. T. A. John, General Agent St. L. & S. F. R. R." Plaintiff testified that, in his general work of soliciting passengers and freight for his road, certain other railroads, including the defendant company, would receive benefits, by virtue of the fact that such passengers and freight would be carried into and out of Montana over such other roads by connection with his road. He said he had frequently routed goods for his customers so that the shipments would go over the Northern Pacific road, and that he gave most of the passenger business to that company because it furnished the best service. On the part of the defendant, there was testimony to the effect that there was no consideration for the issuance of such passes, no obligation to issue them, and that their exchange was simply a matter of courtesy between the roads.

At the close of all of the testimony, the defendant moved the court to direct a verdict in its favor, for the following reasons: (a) Because there was no proof that defendant undertook to carry plaintiff for a reward; (b) because mere proof of derailment of the train was no evidence of actionable negligence toward a person in plaintiff's situation; (c) because of variance between the allegation of the complaint to the effect that plaintiff was being carried for hire, and the proof that he was being carried gratuitously under special contract limiting the liability of the defendant; (d) because plaintiff had voluntarily agreed not to hold the defendant liable for injuries received; (e) because there is no allegation in the complaint of other than ordinary negligence, for which, under its contract, defendant was not liable. The court overruled the motion and instructed the jury, over defendant's objection and on motion of plaintiff, that "a common carrier cannot be exonerated by any agreement made in anticipation thereof from any liability for the gross negligence of himself or his servants." "Therefore," the court continued, "if you believe that the defendant corporation was

guilty of gross negligence, or that its servants were guilty of gross negligence which proximately caused the derailment of the train, * * * then your verdict must be for the plaintiff.'' This was the court's instruction No. 1. The court, also over defendant's objection, further charged the jury as follows:

''(2) You are instructed that 'gross negligence' is the want of slight care and diligence. 'Gross negligence' is an entire failure to exercise care, or the exercise of so slight a degree of care as to justify the belief that there was an indifference to the rights and welfare of others. * * *

''(4) The court charges you that the pass on which the plaintiff, John, was riding, on the train of the defendant railway company, at the time of its derailment, was a free or gratuitous pass; that, on account thereof, the defendant railway company cannot be held liable in this case for what is called ordinary negligence; but before the plaintiff can recover in this action, you must find, by a preponderance or greater weight of the evidence, that the derailment in question was caused by the gross negligence of the defendant railway company, or its agents or servants.''

1. We think the district court was correct in charging the jury that John was riding on a free or gratuitous pass. The plaintiff, by tendering instruction No. 1, tacitly assented to this and adopted the court's theory that the only question in the case, aside from that of damages, was whether the defendant had been guilty of gross negligence. It is contended by the defendant that as the pass was an interstate pass, good over the lines of its road in six states, it was subject to the provisions of the Act of Congress approved June 29, 1906, known as the "Hepburn Act" (Act June 29, 1906, Chapter 3591, 34 Stat. 584 [U. S. Comp. St. Supp. 1907, p. 892, Supp. 1909, p. 1149]), and was therefore illegal and void if given in exchange for another pass, for the reason that the Act prohibits the receipt of anything save money for transportation. Counsel cite an order of the Interstate Commerce Commission, under date September 15, 1909, and the case of *United States* v. *Chicago, I. & L. Ry.*

*Co.* (C. C.), 163 Fed. 114, in support of their position.    But we do not find it necessary to base our judgment on this ground. We find no testimony in the record which would warrant the conclusion that any consideration passed for the giving of the pass, or that it was anything more, as defendant's witnesses testified, than a gratuitous courtesy extended by one railroad company to the other.

2. We are of opinion that the court was in error in submitting to the jury the question of fact whether defendant had been guilty of gross negligence.    There is nothing in the record to support an affirmative finding of such negligence.    As will be hereafter shown, gross negligence is a matter of proof.    But plaintiff's counsel contend that there are, under our laws (1) no degrees of negligence, and (2) that any negligence by which a passenger is injured is gross negligence.    We cannot assent to either of these propositions.    That degrees of negligence are known to our laws is evidenced by an examination of sections 5253, 5295, 5299, 5300, 5306, 5331, 5354, and 5355, Revised Codes, and recognized in the cases of *Prosser* v. *Montana C. Ry. Co.*, 17 Mont. 372, 43 Pac. 81, 30 L. R. A. 814; *Nelson* v. *Great Northern Ry. Co.*, 28 Mont. 297, 72 Pac. 642; *Robinson* v. *Helena L. & Ry. Co.*, 38 Mont. 222, 99 Pac. 837; and *Neary* v. *Northern Pacific Ry. Co.*, 41 Mont. 480, 110 Pac. 226.    That this is so is a matter to be deplored, but the conclusion cannot be avoided. Aside from any question of what the common law was on the subject, plaintiff's second contention is disposed of by the provisions of our statute (sections 5299 and 5300, Revised Codes, *supra*), which distinctly recognize the fact that a carrier owes a different and higher duty to a person who is carried for reward from that owing to one who is carried without reward.    Those Code provisions read as follows:

"Sec. 5299.    A carrier of persons without reward must use ordinary care and diligence for their safe carriage.

"Sec. 5300.    A carrier of persons for reward must use the utmost care and diligence for their safe carriage, must provide

everything necessary for that purpose, and must exercise to that end a reasonable degree of skill.''

It being the law that a carrier of passengers without reward need only use ordinary care and diligence for their safety, and that a carrier for reward must use the utmost care, it seems to follow that if we should hold this defendant guilty of gross negligence on account of the fact alone that an accident happened, without any evidence as to the cause thereof, we should not only destroy the distinction between gross and ordinary negligence, and slight and ordinary care, but we should be indulging in judicial legislation by declaring that a carrier of passengers without reward must use the utmost care and diligence for their safe carriage, contrary to the expressed will of the legislature. In case of injury to a passenger, a presumption of negligence arises from the mere fact of an accident, when the injury is caused by some thing or agency for which the carrier is responsible. (*Knuckey* v. *Butte Electric Ry. Co.*, 41 Mont. 314, 109 Pac. 979.) In the latter case the court said: ''Proof of the derailment of the train is sufficient''—citing *Pierce* v. *Great Falls & C. Ry. Co.*, 22 Mont. 445, 56 Pac. 867, and *Hoskins* v. *Northern Pacific Ry. Co.*, 39 Mont. 394, 102 Pac. 988. The learned trial judge was evidently of opinion that mere proof of derailment was not *prima facie* evidence of gross negligence, otherwise he would not have submitted the question whether there was any gross negligence. While it may be true. as contended by plaintiff's counsel, that mere proof of derailment or other accident to a train might under certain circumstances furnish an inference of gross negligence, there are no facts in this case to warrant such conclusion.

3. Plaintiff was a passenger. Not a passenger for reward, but a free passenger. Nevertheless the defendant had undertaken to carry him. It sustained toward him the relation of a carrier without reward, and by virtue of section 5299, Revised Codes, *supra,* it owed to him the duty of using ordinary care for his safe carriage. It would be liable for ordinary negligence. (This, of course, without consideration of the exemption conditions of

the pass.)    Section 5298, Revised Codes, provides that a carrier without reward who has begun to perform his undertaking must complete it in like manner as if he had received a reward, unless he restores the person or thing carried to as favorable a position as before he commenced his carriage.    Plaintiff, then, was not a trespasser; nor was he a mere licensee.    Having begun his journey with the permission of the defendant, his right to carriage could not be arbitrarily and unconditionally revoked.    Defendant was under express legal obligation to do one of the two things mentioned in the statute.    At the time of the accident it was in the act of doing the first mentioned.    Having determined that plaintiff was a passenger, and that the defendant owed him the duty to refrain from any act of ordinary negligence to his injury, it becomes necessary to ascertain whether a finding of ordinary negligence on the part of the defendant will be justified by the mere fact that the train was derailed.

What degree of negligence is it that is disclosed, as the law presumes, by the fact that a passenger train is derailed?    Manifestly, ordinary negligence—a lack of ordinary care.    It cannot logically be said that the fact of derailment only raises a presumption of slight negligence, any more than it can be said to raise a presumption of gross negligence.    Mr. Thompson, in his admirable and exhaustive work on Negligence (volume 1, 2d ed., sec. 18, p. 19), refers to "the standard called 'ordinary care.'" He also says in the same connection, commenting upon the common-law duty of a common carrier of passengers to exercise a "very high, exact, and unremitting care and attention": "But even here it has been often pointed out that the care required of the carrier is no more than reasonable care; that is to say, a care proportioned to the great risks attending his business."

The supreme court of the United States, in *Philadelphia P. & R. R. Co.* v. *Derby,* 14 How. 486, 14 L. Ed. 502, and again in *Steamboat New World* v. *King,* 16 How. 469, 14 L. Ed. 1019, said: "When carriers undertake to convey persons by the powerful but dangerous agency of steam, public policy and safety require that they should be held to the greatest possible care and

diligence. And whether the consideration for such transportation be pecuniary or otherwise, the personal safety of passengers should not be left to the sport of chance or the negligence of careless agents. Any negligence in such cases may well deserve the epithet of gross.'' In both of these cases the plaintiff was being carried gratuitously. While we may not, in the light of our statutes, go so far as to hold, in accordance with the above rulings, that any negligence by which a free passenger is injured may be called gross, we feel satisfied that the conclusion is not only logical but in accordance with the accepted notions of the profession that the term ''negligence,'' standing alone, as applied to a carrier of passengers, should, and does, refer to that common degree, or standard, of negligence known as ordinary. And in so holding we do no violence to our statutes, sections 5299 and 5300, Revised Codes, *supra.* Those Code provisions in practical application deal, not with presumptions, but with proof. While the presumption arising from the fact of derailment of a passenger train is that the carrier of passengers, both paid and gratuitous, has been guilty of ordinary negligence or want of ordinary care, and such presumption will serve to make a *prima facie* case of actionable negligence for either class of passengers, yet when, in the absence of circumstances warranting such presumption, it becomes necessary to prove negligence, it is incumbent upon the free passenger to prove ordinary negligence, while the passenger for reward need only prove slight negligence. A plaintiff relying upon gross negligence must offer proof in supplement of the presumption arising from the fact of derailment; while, on the other hand, derailment being shown, a carrier of passengers without reward has the burden of proving the exercise of ordinary care on his part, and a carrier for reward must show that he exercised the utmost care, in order to escape liability.

Again, quoting from Thompson on Law of Negligence, volume 3, second edition, section 2754: ''In every action by a passenger against a carrier to recover damages predicated upon the negligence or misconduct of the latter, the burden of proof, in the first instance, is, of course, upon the plaintiff to connect the defendant

in some way with the injury for which he claims damages.  But when the plaintiff has sustained and discharged this burden of proof by showing that the injury arose in consequence of the failure, in some respect or other, of the carrier's means of transportation, or the conduct of the carrier's servants, then, in conformity with the maxim *res ipsa loquitur,* a presumption arises of negligence on the part of the carrier or his servants, which, unless rebutted by him *to the satisfaction of the jury,* will authorize a verdict and judgment against him for the resulting damages.  Stated somewhat differently, the general rule may be said to be that where an injury happens to the passenger in consequence of the breaking or failure of the vehicle, roadway, or other appliance owned or controlled by the carrier, and used by him in making the transit, or in consequence of the act, omission or mistake of his servants,—the person entitled to sue for the injury makes out a *prima facie* case for damages against the carrier, by proving the contract of carriage, that the accident happened in consequence of such breaking or failure, or such act, omission or mistake of his servants, and that, in consequence of the accident the plaintiff sustained damage.''  It will be observed that the author employs the words ''passenger'' and ''negligence'' without any qualification. Again: ''It is the essential nature of this presumption that it stands in the place of actual proof of negligence, until it is rebutted and overthrown.  This presumption would not be a presumption—would not have any evidentiary value for the purpose of influencing the practical result of the trial—unless the court were allowed to explain it to the jury.  The nature of the presumption is such that, unless rebutted *to the satisfaction of the jury,* it decides the case in favor of the plaintiff, upon his making proof of the damages sustained; or, to say the least, it takes the question of the negligence of the carrier to the jury.  If there is no countervailing evidence—nothing to explain the accident consistently with due care on the part of the defendant, the plaintiff is plainly, by force of this presumption, entitled to a verdict, and no sound reason is perceived

why the judge should not be allowed to so instruct the jury."
(3 Thompson on Negligence, sec. 2770.)

This court in the case of *Hardesty* v. *Largey Lumber Co.*, 34
Mont. 151, 86 Pac. 29, through Mr. Justice Holloway said: "It
may be conceded that, unaided by any presumption, the evi-
dence offered by plaintiff is insufficient to charge the defendant
with negligence.  But counsel for respondent invoke the doctrine
of the maxim *'res ipsa loquitur,'* and insist that this case as
made by the plaintiff presents an instance wherein the presump-
tion of defendant's negligence arises from the proof of the acci-
dent.  Of course, the general rule of law is that negligence is
not inferable from the mere occurrence of the accident; but to
this rule is the well-understood exception that, where the thing
which causes the injury is shown to be under the management
and control of the defendant, and the accident is such as in the
ordinary course of things does not happen if those who have
such management and control use proper care, it affords rea-
sonable evidence, in the absence of explanation by the defend-
ant, that the accident arose from the want of ordinary care by
the defendant.  Under such circumstances, proof of the happen-
ing of the event raises a presumption of the defendant's negli-
gence, and casts upon the defendant the burden of showing that
ordinary care was exercised."

Section 5244, Revised Codes, reads as follows: "An employer.
must in all cases indemnify his employee for losses caused by
the former's want of ordinary care."  In the *Hardesty Case,*
*supra,* the court distinctly held that this section is directly ap-
plicable to cases arising between master and servant on account
of personal injuries sustained by the latter in the course of
his employment, and that an instruction embodying it was prop-
erly submitted to the jury.  This being so, there can be no
longer any question in this state that, where the doctrine of
the maxim *"res ipsa loquitur"* may be invoked to raise a pre-
sumption of want of care, it is want of ordinary care to which
reference is made.  A master owes the same duty to his ser-
vant that a carrier owes to an unpaid passenger; that is, to

exercise ordinary care for his safety. The statutes so declare. Indeed, we find the following statement in the brief of counsel for the appellant: "Derailment never creates a presumption of *gross,* or of any other than *ordinary* negligence." The supreme court of North Carolina, in *Wright* v. *Southern R. R. Co.,* 127 N. C. 225, 229, 37 S. E. 221, 222, said: "This presumption [of negligence] extends to the occurrence, regardless of the party injured."

We therefore hold that the happening of the accident complained of by the plaintiff raised a presumption of want of ordinary care on the part of the defendant, and that the district court should have so charged the jury.

4. But it is contended by counsel for the appellant that a common carrier, in this state, may by agreement exonerate himself from liability for the ordinary negligence of himself or his servants. That such is the law is settled by the case of *Nelson* v. *Great Northern Ry. Co.,* 28 Mont. 297, 321, 72 Pac. 642, 649, where this court, after quoting sections 2876 and 2877 of the Civil Code of 1895 (now sections 5338 and 5339, Revised Codes), said: "These two sections, construed together, give to the carrier the right by special contract to provide against liability in all cases except when it arises from his gross negligence, fraud, or willful wrong." (See, also, *Rose* v. *Northern Pacific Ry. Co.,* 35 Mont. 70, 119 Am. St. Rep. 836, 88 Pac. 767, and *Donlon Bros.* v. *Southern Pac. Ry.,* 151 Cal. 763, 91 Pac. 603, 11 L. R. A., n. s., 811, 12 Ann. Cas. 1118.)

It is further contended that, as to the plaintiff, the defendant was not a common carrier; and, further, that it had been expressly exonerated from liability for its negligence, by the contract on the back of the pass. But it is immaterial whether the defendant was technically a common carrier on not. If it was, and the pass-contract was valid, it was exonerated from liability, for ordinary negligence, by virtue of the terms thereof; and, if it was not, it nevertheless owed to plaintiff the duty of exercising ordinary care for his safe carriage.

5. This brings us to a consideration of an important question: Is the giving of absolutely free passes prohibited by the Constitution or statute law of this state? The question is one of first impression, and, so far as we are advised, has never been raised in this jurisdiction. Indeed, it is matter of every-day knowledge that the idea has prevailed, since 1903 at least, that the practice has not been illegal, and that additional legislation was necessary in order to make it so. This is evidenced by the fact that measures designed to prohibit the giving of free transportation have since been often advocated and have been introduced in the legislative assembly, but have never been enacted into laws.

Section 7, Article XV, of the state Constitution, provides, in part, as follows: "All individuals, associations and corporations shall have equal rights to have persons or property transported on and over any railroad, transportation or express route in this state. No discrimination in charges or facilities for transportation of freight or passengers of the same class shall be made by any railroad, or transportation, or express company, between persons or places within this state; but excursion or commutation tickets may be issued and sold at special rates, provided such rates are the same to all persons. * * * "

Mr. Justice Hunt, in the case of *Butte, Anaconda & Pac. Ry. Co.* v. *Montana Union Ry. Co.,* 16 Mont. 504, 526, 50 Am. St. Rep. 508, 41 Pac. 232, 239, 31 L. R. A. 298, commenting upon this constitutional provision, said: "This provision, when considered with section 5 of Article XV, demonstrates that the Constitution, in its letter, its spirit, and its policy as well, classes all railroads * * * as public highways, subject to use by the public of right, amenable to the laws governing common carriers forever forbidding all obnoxious favoritisms between any who desire to use such highways. * * * This stable written policy is doubtless the outgrowth of pernicious systems of discrimination and preference which railroad corporations may

have indulged in throughout the land where their powers are unrestrained by constitutional or other restriction."

Section 4337, Revised Codes, is entitled "Discrimination in Charges Forbidden," and reads, in part, as follows: "It is * * * unlawful for any * * * common carrier * * * to charge, demand, collect or receive from, to sell, barter, transfer or assign to, any person * * * any ticket * * * of any class whatever entitling the purchaser or holder thereof to transportation by the common carrier issuing such ticket, * * * for a greater or less sum or price than is charged, demanded, collected or received by * * * such common carrier * * * for a similar ticket * * * of the same class. Any * * * common carrier * * * who * * * shall violate the provisions of this section shall be guilty of a misdemeanor and upon conviction thereof shall be fined in the sum not exceeding one thousand dollars for each offense."

In addition to the foregoing, under the title-heading, "Crimes against the Public Health and Safety," we have section 8524, Revised Codes, which reads as follows: "Every person or corporation who owns, carries on or has control of a railroad and fails to observe any of the duties prescribed by law in reference to railroads, the penalty for which is not otherwise provided for in this Code, is punishable by a fine not exceeding five thousand dollars."

Stripped of those portions which are not directly material to this investigation, the constitutional provision reads as follows: "All individuals * * * shall have equal rights to have persons * * * transported on or over any railroad * * * in this state." We understand this to mean that all persons have equal natural rights to be carried on any railroad in the state. "No discrimination in charges * * * for transportation of * * * passengers of the same class shall be made by any railroad between persons * * * within this state." And the Code provision (section 4337, Revised Codes) reads thus: "It is * * * unlawful * * * for any common carrier * * * to transfer * * * to any person * * *

any ticket * * * of any class whatever entitling the * * * holder thereof to transportation * * * for a * * * less sum or price than is· charged * * * by such common carrier * * * for a similar ticket * * * of the same class." Or it may perhaps be read thus: "It is * * * unlawful * * * for any common carrier * * * to charge * * * any person (for) any ticket * * * of any class whatẹver entitling the purchaser * * * to transportation * * * a greater sum or price than is charged by such common carrier * * * for a similar ticket * * * of the same class." The phraseology is not to be commended, but the meaning and the principle involved are clear. This section is a part of the so-called "anti-scalpers" law, passed in 1893 (Laws 1893, p. 152, sec. 7), and its purpose, as we understand it, was not only to benefit the railroad companies by driving the ticket brokers out of business, but to provide against loss, so far as possible, to the purchaser of an unused ticket, by requiring that it should, under certain circumstances, be redeemed by the seller; and so it was enacted that the railroad companies, being relieved of the pest of the ticket "scalpers," should themselves be prohibited from indulging in kindred practices, by pernicious discrimination between persons of the same class. To that end it was enacted that the offense should be a misdemeanor and punishable accordingly.

Recurring to the constitutional provision: It is not permitted to a railroad company to arbitrarily classify the patrons of its road. Even the legislative assembly in making classifications for taxation and license purposes must exercise a reasonable discretion in so doing. (*Quong Wing* v. *Kirkendall*, 39 Mont. 64, 101 Pac. 250.) The idea of arbitrary and unreasonable classification for any purpose, when benefits are to be conferred or penalties imposed, is abhorrent to the principles of all American constitutions, founded, as they are, upon the consideration that all men are equal before the law.

By the report of the case of *State* v. *Southern Ry. Co.,* 122 N. C. 1052, 30 S. E. 133, 41 L. R. A. 246, it appears that the

defendant was indicted for an unlawful discrimination in the transportation of passengers under a statute (Laws 1891, Chapter 320, sec. 4) of which the following is a copy: "That if any common carrier subject to the provisions of this Act shall directly or indirectly, by any special rate, rebate, draw back or other device, charge, demand, collect or receive from any person or persons a greater or less compensation for any service rendered or to be rendered in the transportation of passengers subject to the provisions of this Act, than it charges, demands or collects or receives from any other person or persons for doing for him or them a like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances and conditions, such common carrier shall be deemed guilty of unjust discrimination, which is hereby prohibited and declared unlawful." The Act then goes on to provide for certain exceptions from its general provisions. The particular offense charged against the defendant was that it issued an annual free pass to one Grant, a member of the North Carolina General Assembly, and allowed him to ride thereon between points within the state. The court said: "The question presented for our decision is: Does the Act prohibit and make indictable the giving of free transportation to passengers by common carriers?" This question is then, in an exhaustive opinion, concurred in by all the justices except Douglas, J., answered in the affirmative as to both propositions involved therein. Douglas, J., concurred in the opinion that the Act prohibits the giving of free passes, saying: "Such a construction is in strict accordance with the settled rules of judicial interpretation and with the highest principles of public policy." He, however, held to the view that the case was *sui generis,* and the defendant not liable to punishment for violation of the Act, so long as the giving of free passes was only included therein by implication; and with this view the writer is personally inclined to agree.

We find no difference in principle between the North Carolina Act and the provisions of the laws of Montana above

quoted. The only difference of any kind is that the legislature of North Carolina to an extent classified the general public by providing that free transportation or reduced rates might be given to certain excepted persons and institutions, while our laws provide that there shall be no discrimination between persons *of the same class,* or in the transfer or sale of tickets *of the same class;* and as the persons to which this opinion relates, as will hereafter be shown, are all in the same class, such difference can have no bearing upon the result here. That the North Carolina decision is directly applicable to this case is evidenced by the fact that conditions here, upon which our laws are designed to operate, are the same as those set forth at length in the opinion of the North Carolina court. There is no greater justification for giving free passes to employees of other railroads than there is for giving like evidences of a right to free carriage to state officials, as such. It is matter of common knowledge in Montana that, in accordance with a custom that has obtained for many years, members of the executive, legislative, and judicial branches of the state government, and some county officers, are furnished by the railroad companies with that form of free transportation known as "passes," and in some cases by other transportation companies also. Why should this be so? The practice has popularly come to be known as the "pass evil," and the writer undertakes to say that public sentiment is almost universally opposed to it, and that for the very reason which courts have always felt justified in acting upon, to-wit, that it involves an arbitrary, unwarranted, and unjust classification of persons who occupy the same relation toward the transportation companies. It is the constant and natural protest of the givers and receivers of these passes that no consideration is expected in return therefor. A judge who was thought to be influenced in his decisions by the fact that he had a free pass in his pocket would be promptly declared venal and unfit. The law provides ample remuneration, in the way of mileage, for those officers who are obliged to travel on official business. Why should they be furnished with free

passes? Honorable members of the legislative assembly would be greatly incensed by the suggestion that the free passes in their pockets influenced their action upon legislation in which the railroads were interested. Why, then, should they ride free of charge? Abundant provision is always made for the payment of their mileage in coming to and going from the capital. Indeed, the recipients of these passes have been often obliged to protest, of late years since the subject has been agitated, that nothing is expected to be given or received in exchange therefor; in other words, that they are purely complimentary. This is no doubt true; it simply emphasizes the fact that such passes are gratuitous. And the whole system of free and unclassified pass giving is made odious by a consideration of the fact that, so long as free passes are so generally given, any judge or public officer who refuses to accept one or who ostentatiously returns it to the giver invites the imputation of hostility toward the railroads. All public officers should be, as Cæsar's wife should have been, above suspicion. What justification can there be for dividing the traveling public into free pass holding and nonfree pass holding persons?

Our Constitution allows classification, but not unreasonable classification. In the absence of classification by the legislature, the railroads may themselves make reasonable classifications. But classification into public office holding and nonpublic office holding persons is clearly arbitrary, vicious, unreasonable, and therefore illegal and void; and we believe it will be conducive to a more healthy condition of the body politic to have this made plain without further delay. And if one pays full fare, and his neighbor no fare at all, is the discrimination not more pronounced than would be the case if the latter paid only half fare? We can find no warrant for holding that this constitutional provision and this statute (section 4337, Revised Codes) were intended to apply only to paying passengers, or to passengers using exactly the same kind of ticket. The evil sought to be counteracted was fundamental, not merely nominal. The Constitution seems to us too plain to require any interpretation.

It distinctly says that all persons have equal rights to have
themselves carried over railroads, and that no discrimination in
charges for being so carried shall be made between persons of
the same class. That this provision was intended to be of uni-
versal application, except in the case of excursion or commu-
tation tickets, is evidenced by the fact that the sale of such
tickets is specially permitted. If I travel on a free pass, and
my neighbor, who is in the same class with me except that he
holds no public office, is obliged to pay fare, I should not wel-
come the task of convincing him that we were enjoying equal
rights of carriage or that our relative situations spoke no dis-
crimination between us. And the ordinary layman who has a
lawsuit against a railroad company may have some justification
for feeling that he is not on equal terms with his opponent, if
the judge who tries his case or hears his appeal has accepted a
complimentary pass from the latter. We can see no difference
between an unlimited pass and an unlimited ticket, or in effect
between a pass and a limited ticket, except, perhaps, that the
holder of the pass enjoys greater privileges than does the holder
of the ticket. If there were any such difference, the statute
could be nullified by a mere name. The fact that this construc-
tion has never before been placed upon the Constitution or stat-
ute law, or even the consideration that the lawmakers did not in
terms prohibit that particular form of evil known as the giving
of free "passes," are not of sufficient weight to change our
views of the matter. It is never too late to put the right con-
struction upon a law. That the framers of the Constitution
and the members of the legislative assembly had in view the
general purpose of prohibiting the giving of special privileges
and unjust discrimination between individuals occupying the
same relative situation toward railroad companies is clear; and,
if the giving of free passes is repugnant to this general purpose,
then it is prohibited, although "passes" are not specifically
mentioned, either in the Constitution or the statute. This same
mischief existed at the time of the adoption of the Constitution

and the passage of the statute; therefore we may indulge the inference that, being within the legitimate scope of the general purpose sought to be effected, the intention was to remedy it. "It is the duty of judges to so construe the Act [remedial statute] as to suppress the mischief and advance the remedy. This injunction is simply to carry out the intention of the lawmaker, which is the cardinal aim with reference to all statutes. The intention in statutes which are for this purpose recognized or enacted *pro bono publico* is more liberally inferred, and to a greater extent dominates the letter, than is admissible in dealing with those which must be strictly construed.  *  *  *  Liberal construction is given to suppress the mischief and advance the remedy. For this purpose it is a settled rule to extend the remedy as far as the words will admit, that everything may be done in virtue of the statute in advancement of the remedy that can be done consistently with any construction." (2 Lewis' Sutherland on Statutory Construction, secs. 583, 605.) It is true that there is a penalty attached to the violation of the statute (section 4337, Revised Codes), and in this regard it should be construed as are other penal statutes (section 8096, Revised Codes); but that portion which seeks to prohibit in general terms unjust discrimination between individuals should be liberally construed, with a view to carrying out the intention of the lawmaking body. A statute may be remedial in one part or purpose and penal in another. (*Smith* v. *Townsend,* 148 U. S. 490, 497, 13 Sup. Ct. 634, 37 L. Ed. 533.)

We conclude, therefore, that the giving of free passes, such as are referred to in this opinion, to the persons we have mentioned as not properly distinguishable by classification from the general public, is prohibited by the Constitution, and also under the penalties mentioned in the statutes above quoted and considered. It therefore follows that the carriage of the plaintiff by the defendant without compensation was an illegal act. The giving of the pass being prohibited by law, it, including the exemption contract on the back thereof, was a nullity.

6. But can this holding avail the plaintiff? Appellant earnestly contends that it cannot, and cites in support of its position the case of *Muldoon* v. *Seattle City Ry. Co.,* 10 Wash. 311, 45 Am. St. Rep. 787, 38 Pac. 995, wherein the court said: "It is maintained that because the Constitution of the state forbids transportation companies to grant passes to public officers, when that prohibition was violated by respondent, both the pass and the conditions were void and the parties were placed in the position that the railroad company was carrying the appellant as though he were an ordinary free passenger and was subject to its ordinary liabilities in such cases. * * * The appellant received the pass which he knew the corporation had no right to give him, and he availed himself of its privileges, and he ought to be estopped from saying that that which was the very means by which he occupied a place in the respondent's car was unlawfully given him. He was there under the license of a pass, and he cannot be heard to say that his relation to the respondent was any other than that which he voluntarily made it." The cases of *Northern Pacific Ry. Co.* v. *Adams,* 192 U. S. 440, 24 Sup. Ct. 408, 48 L. Ed. 513, *Missouri K. & T. Ry. Co.* v. *Trinity County Lumber Co.,* 1 Tex. Civ. App. 553, 21 S. W. 290, and *Duncan* v. *Maine Central Ry. Co.* (C. C.), 113 Fed. 508, are also cited to the same point. In the Duncan case the court said: "Rejecting the pass as void, the plaintiff puts himself in the position of one who was on the train of the defendant without its permission, and without any intention of paying the fare which would entitle him to be regarded as a passenger. The consequence, therefore, of the plaintiff putting himself in that position, is to leave him as an unauthorized intruder, and to place him outside of those rules of law which give protection against the mere negligence of the servants of a common carrier."

But, as heretofore pointed out, under our statutes the plaintiff was neither an intruder nor a bare licensee. The defendant, having undertaken to carry him, owed him a certain statutory duty, to-wit, to use ordinary care for his safe carriage. We

doubt if it can properly be said that the parties were *in pari delicto*. At any rate, the plaintiff did not stand in the same relation to the railway company as would have been the case had the pass been issued to him personally for his own individual use. The courtesy extended was not to John, but to his employer, the St. Louis & San Francisco Railroad Company. He was on business for his company. The pass ran to him as general agent, and he so signed the agreement on the back thereof. It may be presumed that he was not an entirely free agent, but was required to travel on the pass. Under the circumstances, it must have been expected that he would do so. No penalty attached to receiving the pass or the free transportation, while, on the other hand, the act of the defendant was prohibited by law. It may well be considered that by the joint action of the defendant railway company and the St. Louis & San Francisco Railroad Company John was placed in the situation in which he found himself.

But we are able to place our decision on this branch of the case on other and higher grounds. Asserting again that John was a passenger: He was in the care and custody of the defendant. The law declares that no valid contract existed between them. The pass and its conditions were nullities—in legal effect they had never existed. The duty which a carrier owes to its passengers is founded, not in contractual relation, but in public policy. The preservation of human life and the safety of human limbs are so highly regarded by the law that it has always been its policy to safeguard both when intrusted to the keeping of those who, as was so well said by Mr. Justice Grier, in *Philadelphia etc. R. R. Co.* v. *Derby, supra,* "undertake to convey persons by the powerful but dangerous agency of steam." John was in a situation created, not by himself, but by the law. The legal relation which he bore to the defendant was created by the law. Being a passenger, he had not the power to place himself as an individual in a legal situation which would leave him outside the pale of those beneficent principles upon which is founded the public policy of the state. We quote from the

opinion of the supreme court of North Carolina in the case of *McNeill* v. *Durham & C. R. Co.* (on rehearing), 135 N. C. 682, 47 S. E. 765, 67 L. R. A. 227: "The pass, issued in pursuance of an illegal contract and for the purpose of carrying out its unlawful purpose, inherits its invalidity. The defendant was free at all times to decline to carry the plaintiff except upon the payment of the usual fare, and to eject him from the train upon refusal to pay. The fact that the pass had expired makes no difference, as, in its character as a contract, it never had any legal exist· ence. Being without legal existence, it was equally devoid of legal effect, and, conferring no rights upon the plaintiff, im- posed upon him no obligations which the law will enforce. * * * The pass itself being worthless, the conditions on the back thereof could have no application. * * * It is not the unlawful contract for free transportation which renders a rail- road company liable to the penalty, but it is the transportation itself. * * * We must bear in mind that while the statute renders absolutely void any contract for free transportation, so that neither party thereto can acquire any rights thereunder, it imposes the penalty only upon the transportation company. The act of free transportation alone is criminal. The party accepting such transportation is not guilty of a criminal act, whatever moral blame may attach to the reception of unlawful favors. Therefore in contemplation of law the parties cannot be considered *in pari delicto.* * * * It is often said that one becomes a passenger by virtue of a contract. This is not always. so. * * * But it may be said that the law raises an implied contract. Even if we accept that form of expression, it simply means that the law imposes upon a common carrier certain duties and liabilities which adhere to the nature of his calling. We prefer to adopt the more direct expression, and say that those duties and liabilities are imposed by law upon common carriers upon considerations of public policy independent of contract, and arise from the nature of their public employment. * * * One such condition is the inherent liability of the carrier for all injuries proximately resulting from its own

negligence or that of its servants. But, as we have already said, in the case at bar there was no legally existing contract, which is equivalent to saying that there was no contract at all.'' In that case the plaintiff was injured by the negligence of the railroad company while riding on a pass which was void under the statute. On the pass were printed substantially the same conditions of exemption from liability as those we have considered in this case. It was held that plaintiff was a passenger and entitled to recover as such, not being *in pari delicto* with the company in the violation of the law.

7. As has been seen, the trial resulted, on account of the fact that the court held that plaintiff was not a passenger for hire, in a departure from the original theory of his counsel as evidenced by his complaint; and the court gave to the jury a definition of ''gross negligence,'' which is now claimed by counsel for the appellant to be erroneous. Neither consideration is sufficient to warrant a reversal. It is the policy of the law that immaterial variances between the allegations of a pleading and the proof should be disregarded by the courts, unless the adverse party has been misled thereby to his prejudice. The defendant was, upon the record, liable in damages as a matter of law. No attempt was made to rebut the presumption of negligence arising from the fact of derailment. The court might properly have charged the jury that the only disputed questions of fact were the extent of plaintiff's injuries and the amount of damages sustained. (See *Consolidated Gold & Sapphire Co.* v. *Struthers,* 41 Mont. 565, 111 Pac. 152.) As there arose a presumption of ordinary negligence from the fact of derailment, and plaintiff was entitled to recover, regardless of whether he was a passenger for hire or not, without proof of gross negligence, no prejudice could result to the defendant on account of the errors complained of, conceding them to have been such. And, in any event, a technically proper retrial would simply necessitate an amendment of the pleadings, with the same ultimate result. Under such circumstances, a new trial ought not to be ordered.

8. It is claimed that the damages are excessive. At the time of the injury plaintiff was thirty-nine years of age and in perfect health. His salary was $1,800 per year. He now intermittently suffers from a pain in his head, he sleeps poorly, his right side is partially paralyzed, and he has lost the use of his voice. He testified that at the time of the first manifestation of paralysis he suffered "pain unbearable." One witness said: "He is a physical wreck now." The physicians testified that his injuries were probably permanent and would eventually cause his death. In view of this evidence, we cannot say that the jury, with whom the matter primarily rested, rendered an excessive verdict.

The judgment and order appealed from are affirmed.

*Affirmed.*

MR. CHIEF JUSTICE BRANTLY concurs.

MR. JUSTICE HOLLOWAY: I am unable to agree with the conclusion reached by the majority of the court as announced above. If the pass upon which John was riding at the time he was injured is invalid for any reason, its invalidity must be determined by reference to section 7, Article XV, of the state Constitution, or section 4337, Revised Codes, or both, for there are not any other provisions of law affecting the question, so far as my investigation discloses.

1. That the Constitution does not forbid a railway company issuing passes or giving free transportation seems to me beyond question. The Constitution declares that all persons shall have equal rights in transportation by common carriers. This does not mean anything more than that the common carrier cannot accept one person as a passenger, and refuse to accept another under like circumstances. The Constitution also declares: "No discrimination in charges * * * for transportation of * * * passengers of the same class shall be made by any railroad * * * company, between persons or places within this state." This does not prohibit discriminations between persons, but only forbids discriminations between persons of the

same class. It is a clear recognition of the right of a railroad company, in the absence of any legislation on the subject, to make a classification of passengers and to deal differently with the different classes. There is not now any existing statute by which the legislature has sought to classify passengers; but there are statutes which recognize two distinct classes. Sections 5297, 5298, and 5299, Revised Codes, refer to passengers without reward, or gratuitous passengers; while sections 5300–5304 deal with passengers for reward, or passengers who pay fare. If, then, sections 5297, 5298, and 5299 are in force and effect, it is not unlawful for a railway company to carry *some* passengers gratuitously. Who, then, are the passengers who may be lawfully carried without reward? The legislature has not designated them. In fact, it has not made any classification of passengers, as it might have done under the Constitution, but has contented itself with the recognition of the two classes above. That the legislature might classify passengers and provide that free transportation should not be given the members of one class and leave the members of the other class free to accept passes is beyond question. There is not any constitutional prohibition against such legislation, while section 5 of Article XV of the Constitution provides that the legislative assembly shall have power to regulate and control by law the rates for transportation of passengers from one point to another in this state. If the legislature had made such a classification as indicated above, the only question which could be raised would be: Is the classification so far unreasonable as to warrant the courts in holding the statute invalid?

Whether or not any classification is unreasonable depends upon a variety of circumstances. A legislative classification is presumed to be reasonable (*Quong Wing* v. *Kirkendall,* above), and the burden of showing that it is unreasonable is upon the person who asserts it (*State* v. *McKinney,* 29 Mont. 375, 74 Pac. 1095, 1 Ann. Cas. 579). If, then, the legislature of Montana had made the classification to which I refer above, and had provided that class A should be composed of the employees of the

railways operating in this state, and the employees of other roads which exchange employees' passes with the roads in this state, and class B should comprise all other persons, and that the persons named in class A might be carried gratuitously, but that it should be unlawful for any railway company to give any pass, free transportation, or reduced rate to any member of class B, I am convinced that such a statute could not be successfully attacked on the ground that the classification is unreasonable. While I have not been able to find any decided case directly passing upon just such a statute, a reference to legislation upon the subject will indicate the view quite generally entertained by legislators, and, while legislative interpretation is not binding upon courts, it is at least entitled to very great consideration.

The Constitution of Alabama, Article XIV, section 22, the Constitution of Florida, Article XVI, section 30, the Constitution of Illinois, Article XI, section 15, the Constitution of Mississippi, Article VII, section 186, and the Constitution of Nebraska, Article XI, section 7, are in all essentials substantially alike, and provide that the legislatures of the respective states shall pass laws to prevent unjust discrimination in the rates for passengers traveling on railroads between points within the respective states.

The Constitution of California, Article XII, section 21, and the Constitution of Washington, Article XII, section 15, provide that no discrimination in charges for transportation shall be made between places or persons by any railroad. The Constitution of Arkansas, Article XVII, section 3, and the Constitution of California above, provide that a railroad company shall not charge more for carrying any passenger a short distance than is charged for carrying another passenger a longer distance in the same direction. The Constitution of Arkansas also prohibits any unjust discrimination in charges for passengers by any common carrier. The Constitution of Idaho, in Article XI, section 6, contains the same provision as that found in the Constitution of Montana, in Article XV, section 7 above.

In every one of these states, excepting Illinois, there is in force a statute forbidding railroads giving passes to certain persons or to persons generally, with designated exceptions. Alabama permits passes to be given to railroad commissioners and their employees, to the officers of the Y. M. C. A., to the employees of the particular railroad issuing the passes, and to the employees of another road with which the first has .exchanged employees' passes. A few other classes of persons are also excepted from the operation of the general anti-pass statute. (Alabama Code, 1907.)

In Arkansas the statute first forbade railroads giving passes to any public officer. In 1895 this was amended so as to permit sheriffs to accept passes, and in 1903 it was again amended to permit the superintendent of public instruction to accept passes. (Sandel & Hill's Digest of the Laws of Arkansas, sec. 6275.)

In California the statute only prohibits passes being given to state officers. (Laws 1909, Chapter 312.)

In Florida the provisions of the anti-pass law extend only to members of the legislature, salaried officers of the state, and to delegates to political conventions. (General Statutes 1906, secs. 3634–3636.)

In Idaho the anti-pass law reaches only to members of the legislature, members of the judiciary, to certain designated executive officers of the state, and to certain county officers. (Laws of Idaho, 1909, p. 296.)

In Mississippi many classes of persons are excepted from the provisions of the general anti-pass statute, including the employees of the particular road issuing the passes, and the employees of another road with which the first one exchanges passes for employees, officers, etc. Passes are forbidden to certain public officers, to candidates for office and to members of political committees, but are required to be furnished to the members and the secretary of the railroad commission, who can use them, however, only when traveling on official business. (Code of Mississippi 1906, secs. 1306, 3727, 4844, 4859 and 4873.)

In Nebraska the anti-pass law excepts from its provisions several classes of persons, and permits passes to be given to the employees of the particular road issuing them, and to the employees of another road with which the first one exchanges employees' passes. (Cobbey's Annotated Statutes of Nebraska, 1907, sec. 10664.)

In Washington the statute forbids any unjust discrimination in rates charged passengers by any railroad company, but from its provisions are excepted a number of classes to the members of which free transportation or reduced rates may be given,— among the classes are ministers of the Gospel, inmates of hospitals, students going to and returning from schools within the state, employees of the roads and their families, ex-employees in search of work, and the families of employees killed while in the service of the roads. (Remington & Ballinger's Annotated Statutes of Washington 1909, sec. 8641.)

In Illinois they do not seem to have any anti-pass laws, but recognize the right of the roads to issue passes, for they have a statute making it a crime to fraudulently use or sell a pass. (Supplement to Starr & Curtis' Statutes of Illinois 1902, p. 402, sec. 103.)

The Act of Congress, of June 29, 1906, known as the "Hepburn Bill," prohibits railroads engaged in interstate commerce from giving any pass, free ticket or free transportation to any passengers except to certain classes of persons enumerated, and among the classes to the members of which passes may be given are included the employees of the road issuing the passes and their families and the employees of other roads with which the first road exchanges employees' passes. (34 Statutes at Large, 584.) Other states having anti-pass laws make similar exceptions.

I have not been able to find that the constitutionality of any of the foregoing statutes has ever been tested in the courts. Apparently, the right of the several legislative bodies to make the classifications of passengers disclosed in the statutes has never been questioned. Many of these laws have been in force for

years, and their very existence is evidence of the fact that in making the classifications the several legislative bodies considered the classifications reasonable. If the legislature can thus classify passengers, and in one class include the employees of the particular road issuing the passes and also the employees of another road with which the first one exchanges passes for employees, and if such classification is reasonable when made by the legislature, it is not less reasonable when made by a railroad company itself, in the absence of legislative classification.

While our Codes recognize two classes of passengers—(1) gratuitous passengers, and (2) passengers who pay fare—they do not designate the particular persons who shall compose either class. But if sections 5297, 5298, and 5299, Revised Codes, above, have any force or effect whatever, there are gratuitous passengers, or passengers who may lawfully be carried free by the railroads from point to point within this state.

If the legislation in any of the states referred to above, or the legislation by the Congress of the United States, is valid, then the legislature of Montana was clearly within its right and exercising legitimate legislative functions, when in 1895 it enacted section 908 of the Civil Code, prohibiting the railroads from giving passes to any member of the legislative, executive, or judicial departments of this state. For the same reason our legislature might properly enact a general anti-pass law and except from its provisions the employees of every railroad in this state, and also the employees of any other road which exchanges employees' passes with the roads operating in this state. If the legislature can make this classification, then I insist that, in the absence of such legislation, the railroads themselves can make it.

At the time of his injury, John was employed by the St. Louis & San Francisco Railroad Company, a company which exchanged employees' passes with the Northern Pacific Railway Company, and John was riding upon his employees' exchange pass. In putting the employees of the St. Louis & San Francisco road in a class, in issuing passes to them—to John among

the rest—I insist that the Northern Pacific Company was not guilty of any unjust discrimination between persons of the same class; that the pass John used was not unlawfully issued; that its use by him was not forbidden by the Constitution or the laws of this state; that he was bound by the contract indorsed on the pass; that it was incumbent upon him to show something more than ordinary negligence on the part of the railway company, and, as he failed to do so, he is not entitled to recover upon the record presented here.

2. Section 4337, Revised Codes, does not prohibit the giving of passes or the free transportation of passengers. It only prohibits a railway company from charging one person more than it charges another person for the same class of ticket. This section is section 7 of an Act entitled "An Act to Regulate the Sale and Redemption of Transportation Tickets of Common Carriers," approved March 13, 1893, and carried forward into the Revised Codes as section 4337, above. The Act was popularly known as the "Anti-scalper Act," and was designed to deal with the evil of the so-called "scalpers' tickets." There is not a suggestion in the Act anywhere that it was meant to prohibit the giving of passes or free transportation, and, since it is a highly penal statute, it should be construed according to the fair import of its terms. In other words, if the legislature intended that it should prohibit the giving of free passes or free transportation, then such intention should be carried into effect; but, unless such intention can be gathered from the language employed, its terms should not be extended by implication, and thereby the street and steam railroads of this state held liable for the payment of a heavy fine for every passenger carried on a pass or gratuitously from point to point within this state within the last year. It is a cardinal rule of interpretation of statutes that the intention of the legislature in enacting them shall be ascertained, if possible, and, when ascertained, shall be given force and effect. To my mind there is not anything in the Anti-scalpers' Act to indicate that the legislature intended to prohibit the giving of

passes, while there are surrounding it circumstances which tend strongly to. indicate that such was not the intention. Two years after the Anti-scalpers' Act was passed, the legislature enacted what are now sections 5297, 5298, and 5299 above, all dealing with the subject of carriage of passengers without reward. These are general provisions applicable to common carriers of passengers. Now, if section 4337 was intended to prevent the free transportation of a person by a common carrier, then the legislature simply made itself ridiculous by enacting sections 5297, 5298, and 5299. At the same time (1895) the legislature also passed section 908 of the Civil Code of 1895, which, among other things, provides: "If any railroad company within this state   *   *   *   shall give to any member of the legislative, executive or judicial department of this state any ticket, pass or privilege other than is given to other patrons of its road generally   *   *   *   [it] shall be deemed guilty of a misdemeanor,'' etc.   This section remained upon the statutes until 1903, when it was amended by eliminating the provision prohibiting the giving of passes. By an Act approved February 26, 1907 (Laws 1907, Chapter 37), the legislature provided that free transportation shall be furnished the railroad commissioners and their official employees when traveling on official business (Revised Codes, sec. 4369). These statutes are cited for two purposes only: (a) To show that the legislature recognized the fact that it is not unlawful for a common carrier to transport some passengers gratuitously; and (b) to demonstrate that, when the legislature intended to prohibit the giving of passes, it was able to command language by which to express its intention—language so plain and forceful as to leave no doubt as to its meaning.

Of course, it is the giving of free transportation, not the piece of cardboard called a pass, against which publicists have inveighed. If, then, the giving of passes or free transportation was prohibited altogether by section 4337 above, it follows as a matter of course that there cannot be any such thing known to the law as a passenger without reward or gratuitous passenger,

for the legislature did not enact sections 5297, 5298, and 5299 for the benefit of those people only who violate section 4337. If the giving of free transportation is prohibited at all by section 4337, it is prohibited altogether, except to the members and employees of the railroad commission, and a railway company is guilty of a crime in carrying one of its own employees as a free passenger. If it could be said that the sections of the Code dealing with gratuitous passengers were superseded by the Anti-scalpers' Act of 1893, carried forward by the omnibus bill (Pol. Code 1895, sec. 5184), then we do not have any statutes defining the duty of a carrier to a gratuitous passenger, and we do not need any, for the reason that it is impossible in the eye of the law for anyone to be a gratuitous passenger, if the Anti-scalpers' Act prohibits the giving of free transportation altogether.

If the sections dealing with gratuitous passengers were superseded by the Anti-scalpers' Act, then John was not a gratuitous passenger, and he was not a passenger for hire, for he did not pay, or offer to pay, or intend to pay, any fare.

As was said before, section 4337 only prohibits a railway company from charging one person more than it charges another person for a ticket of the same class. The courts of this state cannot take judicial notice of the different classes of tickets issued or used by any railway company. Section 7888, Revised Codes, enumerates the facts of which courts may take judicial notice, and the different classes of railroad tickets is not one of them. We have held repeatedly that the courts cannot enlarge the provisions of section 7888, but are restricted by its terms. (*McKnight* v. *Oregon Short Line R. R. Co.,* 33 Mont. 40, 82 Pac. 662; *Bowen* v. *Webb,* 34 Mont. 61, 85 Pac. 740.) There is not any evidence in this record upon the subject of the different classes of tickets issued by the Northern Pacific Railway Company; and, as section 4337 deals only with different classes of tickets, it cannot have any bearing upon this case. In the absence of evidence, it is impossible to say that the pass upon which John traveled was in effect a first-class

ticket, or a second-class ticket, or that it belonged to any class other than a class *sui generis*—the class of gratuitous passes—and there is not a word in this record to show that this pass was given to John upon any different terms or conditions than attached to every other gratuitous pass issued by the Northern Pacific Railway Company.

While the Act of 1907 above would seem to indicate that there is not any public sentiment against the use of passes by public officers, yet, assuming that there is, the same reason for the existence of that sentiment is absent when the holder of the pass is an employee of the road issuing it, or an employee of another road with which the first road exchanges employees' passes. John is not a public officer, but is an employee of another road with which the Northern Pacific exchanges employees' passes, and at the time he was injured he was using his employee's pass.

3. In *State* v. *Southern Ry. Co.*, 122 N. C. 1052, 30 S. E. 133, 41 L. R. A. 246, cited in the majority opinion, the statute there considered prohibits discrimination by the railroads as between persons for services rendered "under substantially similar circumstances and conditions." The court says in the opinion that the crucial point in the case arises from the contention of counsel for the railway company that the services rendered Grant, the legislator who was riding on a pass, and the services rendered other passengers who were compelled to pay full fare, were not necessarily rendered under "substantially similar circumstances and conditions"; but, as the only difference which counsel could show in the circumstances and conditions of Grant and the paid passenger was that Grant was a member of the legislature and the paid passenger was not, the court very readily reached the conclusion that such a distinction did not take Grant out of the prohibited class, that the legislature never intended to divide the people of North Carolina into two classes, one composed of office holders and influential persons, and the other composed of the rest of her citizenship, and permit the members of the first class to be carried free, while the members

of the second were required to pay full tariff rates. But had the North Carolina court been considering the case of Terry A. John, riding over the Southern Railway in North Carolina on a pass such as the one he was using at the time of his injury —that is, a pass given him by the Southern Railway Company as an exchange pass for an employee of the St. Louis & San Francisco road—it would have reached exactly the opposite conclusion from the one it did, for the reason that the statute of North Carolina, considered in that case, makes it lawful for a railway company to give passes to its own employees or to the employees of another road with which the first road exchanged employees' passes.

But the decision of the North Carolina court cannot have any application to this case for another reason. The statute' of North Carolina considered in that case is entitled: "An Act to Provide for the General Supervision of Railroads, Steamboats and Canal Companies, Express or Telegraph Companies doing Business in the State of North Carolina," approved March 5, 1891. It provides for the creation of a railroad commission and defines its duties and powers. It then prohibits unjust discrimination between persons and defines what is meant by "unjust discrimination." Then, as if to emphasize the intention of the legislature in enacting the statute, to prohibit the giving of passes or free transportation except in certain cases, the Act in section 25 enumerates three certain classes of persons who are exempted from its provisions. Class 1 includes destitute and homeless persons transported by charitable societies and the agents of such societies while engaged in such transportation. Class 2 includes ministers of religion, destitute persons when transported by municipal governments, inmates of homes for disabled soldiers, and inmates of soldiers' and sailors' orphan homes. And class 3 includes railway employees. To class 1 free transportation may be given. To class 2 reduced rates only may be) given. While, as to class 3, the Act provides: "Nothing in this Act shall be construed to prevent railroads from giving free carriage to their own officers and employees, or to prevent the principal officers of any rail-

road companies or company from exchanging passes or tickets with other railroad companies for their officers or employees." The supreme court of North Carolina, in applying this statute to the case of Grant, the legislator who was carried by the railway company gratuitously upon a pass, said: "The question presented for our decision is: Does the Act prohibit and make indictable the giving of free transportation to passengers by common carriers? Upon its face clearly it does not in all cases, because in section 25 the giving of such free transportation, or transportation at reduced rates, to certain classes of persons therein particularly specified, is allowed; but the person who received free transportation in this case did not come within either of the exceptions of the statute." And then held that, in thus carrying Grant upon a pass, the railway company was guilty of unjust discrimination as defined in section 4 of the Act; and with that decision I agree fully, but I insist that it cannot be applied to the facts of this case, for I fail to perceive any resemblance whatever between the North Carolina statute and section 4337 of our Revised Codes, above.

4. The complaint alleges that John was a passenger for hire. This allegation is denied in the answer. Upon the trial counsel for the railway company took the position that, if the evidence failed to show that John was a passenger for hire, the result would be such a variance between the pleading and proof as to amount to a failure of proof. This view was urged upon the trial court in a motion for a directed verdict and also in a requested instruction, No. 7. The court denied the motion and refused to give the requested instruction, but gave instruction No. 4, in which the jury was told that John was riding gratuitously upon his pass. Instruction No. 4 must correctly represent the views of the trial court. It must be held to represent the views of both parties, for neither objected to it. Under such circumstances, the court should have directed a verdict for the defendant, for an allegation that John was a passenger for hire is not sustained by proof that he was a gratuitous passenger. In *Schuyler* v. *Southern Pac. Co.* (Utah), on rehearing, 109 Pac. 464, it is said: "If the duties imposed by law for the carriage

of a passenger for hire were other than or different from those imposed for the carriage of a gratuitous passenger, or if a different or higher degree of care was required in the one than in the other, it can readily be seen that no recovery could be had under an averment that the injured person was a passenger for hire on proof that he was a mere gratuitous passenger.'' The language is particularly applicable here, for our Codes do make a distinction between the duty which the carrier owes to the gratuitous passenger and the duty which it owes to the passenger for hire. (Sections 5299 and 5300, Revised Codes, above.)

It is a part of the history of this state that since 1903 repeated efforts have been made to have the legislature of this state enact some kind of an anti-pass statute—a statute that will at least prohibit public officers from being carried gratuitously. These efforts have all failed, for reasons which appealed to the members of the legislature as sufficiently cogent. However desirable it may be that such legislation be had, I insist that it shall be enacted by the legislature, in terms which will disclose the intention so plainly that there will not be left any room for a difference of opinion as to what is meant; and, until that is done, I insist that there is not any legislation in this state upon the subject, and that any man who accepts the benefit of a pass, as John did, shall likewise bear the burden which it imposes, and to which he assents when he signs his name to the contract indorsed on the back.

## ON MOTION FOR REHEARING.

(Submitted October 26, 1910. Decided November 10, 1910.)

MR. JUSTICE SMITH delivered the opinion of the court.

The appellant in this case has filed a motion, supplemented by a printed argument, for a rehearing. We are satisfied with the correctness of the conclusions heretofore announced. However, it is stated in the printed argument that the former decision suggests certain questions, which should be answered in order to clear up any uncertainty as to the rights of the

appellant and other railroad companies, in the matter of free transportation or reduced rates.

We are unable to answer some of the questions propounded because of the fact that they do not affect the public, but only the railway companies themselves, and we are not sufficiently advised as to the circumstances attendant upon the particular cases instanced.   Other questions, however, involve matters of common and every-day knowledge as to the conditions surrounding the persons mentioned; and we have no hesitancy in holding that a railroad company may lawfully issue free transportation, or sell tickets at reduced rates, as the case may warrant, to the following classes of persons:

(1) Employees of the issuing road, and the members of their families.

(2) Doctors, nurses, and helpers being hurried to wrecks.

(3) Soldiers and sailors going to or coming from institutions for their keeping.

(4) Ministers of religion and persons engaged in charitable and religious work.

Members and employees of the Railroad Commission should be allowed to ride free only when traveling on official business. Section 4369, Revised Codes, so provides.   The state and the railroad companies are alike interested in a speedy physical inspection of the subject matter of investigation by such officers. When on private business they should pay fare.   (See section 4394, Revised Codes.)

No reason exists why children, and persons who by reason of physical defects, injuries, or deformities, or other misfortune, are unable to compete with mankind in general, should not be placed in classes by themselves and carried free or at reduced rates.

The motion for a rehearing is denied.

MR. CHIEF JUSTICE BRANTLY concurs.

MR. JUSTICE HOLLOWAY, having dissented from the original opinion, takes no part in this.